# United States Court of Appeals
## For the First Circuit

No. 18-2261

ROLANDO PENATE,

Plaintiff, Appellee,

v.

ANNE KACZMAREK,

Defendant, Appellant,

KRIS FOSTER; RANDALL RAVITZ; JOSEPH BALLOU; ROBERT IRWIN; RANDY
THOMAS; SONJA FARAK; SHARON SALEM; JAMES HANCHETT; JULIE NASSIF;
LINDA HAN; ESTATE OF KEVIN BURNHAM; STEVEN KENT; JOHN WADLEGGER;
GREGG BIGDA; EDWARD KALISH; CITY OF SPRINGFIELD,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Katherine A. Robertson, U.S. Magistrate Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

David H. Rich, with whom Maria T. Davis and Todd & Weld, LLP
were on brief, for appellant.
Luke Ryan, with whom Sasson, Turnbull, Ryan & Hoose was on
brief, for appellee.
Matthew R. Segal, American Civil Liberties Union Foundation
of Massachusetts, Inc., Emma Quinn-Judge, Monica Shah, and Zalkind
Duncan & Bernstein LLP on brief for American Civil Liberties Union
of Massachusetts and Massachusetts Association of Criminal Defense
Lawyers, amici curiae.

June 26, 2019

**LYNCH**, **Circuit Judge**.  This appeal presents novel questions about the scope of absolute prosecutorial and government attorney immunity from claims asserted under 42 U.S.C. § 1983.

Appellee Rolando Penate filed this § 1983 action against seventeen defendants after the dismissal with prejudice of his 2013 Massachusetts criminal conviction for drug distribution. This appeal is from an order denying absolute immunity to one of those defendants, Anne Kaczmarek, a former Massachusetts Assistant Attorney General.  Penate's complaint alleged that Kaczmarek unlawfully withheld (and worked with others to unlawfully withhold) exculpatory evidence from Penate's counsel; from the Hampden County, Massachusetts District Attorney, whose office prosecuted Penate in Hampden County Superior Court; and from that state court.  The withheld evidence showed that a drug laboratory chemist, Sonja Farak, had been battling drug addiction and had tampered with samples she was assigned to test around the time she tested the samples in Penate's case.  Kaczmarek had obtained the evidence at issue while she was prosecuting Farak on state charges of tampering with evidence and drug possession.

After the magistrate judge rejected Kaczmarek's motion to dismiss on grounds of absolute immunity, Penate v. Kaczmarek, No. 17-cv-30119, 2018 WL 6437077, at *16 (D. Mass. Dec. 7, 2018), Kaczmarek filed this interlocutory appeal.  We affirm.

- 3 -

We are required to "make two important assumptions about the case: first, that [Penate's] allegations are entirely true; and, second, that they allege constitutional violations for which § 1983 provides a remedy." Buckley v. Fitzsimmons, 509 U.S. 259, 261 (1993); see also Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 28 (1st Cir. 1995). The first of these assumptions is critical here, as our rejections of Kaczmarek's novel claims to absolute immunity are fact-bound conclusions.

After recounting the allegations in the complaint and the history of this suit, we address Kaczmarek's two theories for absolute immunity.[1] She first argues that she enjoys absolute prosecutorial immunity because the conduct alleged in the complaint occurred during the time period when she was assigned to prosecute Farak. We reject this argument because, on the facts alleged in the complaint, Kaczmarek's decision to withhold evidence from the criminal prosecution of Penate lacked a "functional tie" to her prosecutorial role in Farak's separate case. Buckley, 500 U.S. at 277. Kaczmarek alternatively seeks absolute immunity on the ground that, in performing some conduct alleged in the complaint, she functioned as an advocate for the government in an evidentiary hearing associated with the criminal case against Penate. But certain allegations in the complaint are

_____

[1] Kaczmarek has not raised the defense of qualified immunity.

- 4 -

best read to allege that Kaczmarek played an administrative role concerning this hearing. On that basis, we reject this second argument for absolute immunity.

I.

A. Facts Alleged in the Complaint

Penate was charged by the Hampden County District Attorney with several drug-related offenses on November 16, 2011. The suspected drugs were sent to the Massachusetts Department of Public Health's Amherst Drug Lab and were assigned to Farak for analysis. Farak reported that the substances from Penate's case had all tested positive for the presence of controlled substances.

Farak tested the samples on December 22, 2011, January 6, 2012, and January 9, 2012. Also on December 22, Farak entered on a Diary Card kept as part of her treatment for drug addiction that she "tried to resist using [at] work but ended up failing."

Farak later placed this Diary Card in the trunk of her car, where, as discussed below, it was found, along with similar worksheets, by the state police. Those documents revealed that, during the period that the lab held the samples in Penate's case, Farak had struggled with drug addiction, had frequently consumed drugs while at work, and had often tampered with and used drug samples and supplies held by the lab. At the heart of this case is Kaczmarek's failure to disclose this exculpatory evidence to

- 5 -

Penate, to his prosecutor, and to the court in his criminal proceeding.[2]

The charges against Penate were still pending when the Massachusetts Attorney General's Office (AGO or AG) began investigating Farak for misconduct at the Amherst Drug Lab. On January 19, 2013, AGO investigators obtained a warrant to search Farak's car, searched the car, and seized hundreds of pages of paper, including the Diary Card and other mental health worksheets.

Farak was charged with tampering with evidence and drug possession on January 22, 2013. Kaczmarek, a prosecutor in the AG's Enterprise and Major Crimes Unit, was assigned to prosecute Farak, who ultimately pleaded guilty in January 2014.

The complaint then tracks the AGO's actions related to the exculpatory evidence that Penate claims was unlawfully withheld during his criminal proceeding. The Diary Card and other mental health worksheets first went unmentioned or were

_____

[2] Penate also claims that Kaczmarek somehow violated his constitutional rights by artificially narrowing the scope of the investigation against Farak, after Farak had been arrested and arraigned. But, because that claim concerns Kaczmarek's choices regarding the course of a prosecution she was actually conducting, after a probable cause determination had been made, absolute immunity does bar it. See Buckley, 509 U.S. at 273 ("[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."); see also Kalina v. Fletcher, 522 U.S. 118, 129 (1997) (holding that a prosecutor's "activities in connection with the preparation and filing of . . . charging documents . . . are protected by absolute immunity").

characterized as "assorted lab paperwork" by investigators in police reports and returns for search warrants. "This was not an oversight," the complaint alleges, "but reflected a collective decision on the part of Kaczmarek, . . . [Police Sergeant Joseph] Ballou, and . . . [others] to deny the existence of this highly probative evidence." The complaint then alleges that, around the same time, Kaczmarek discouraged Ballou from following up on an allegation of evidence tampering by Farak in 2005.

In February 2013, Ballou attached copies of the Diary Card and other mental health worksheets to an email to Kaczmarek with the subject line "FARAK Admissions." "Here are those forms with the admissions of drug use I was talking about," he wrote.

In March, neither the Diary Card nor the other mental health worksheets were included in the packets of evidence related to Farak provided to all of the Massachusetts District Attorneys. The packets were accompanied by a letter from the head of the AG's Criminal Bureau, John Verner; the letter explained that the AG was investigating Farak and stated, "Pursuant to this office's obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotic evidence was tested at the Amherst Laboratory, please find the below listed materials . . . ."

That same day in March, Kaczmarek submitted to Verner and her other supervisors a Prosecution Memo that contained multiple references to Farak's mental health worksheets. Kaczmarek stated that the worksheets had "not been submitted to the [Farak] grand jury out of an abundance of caution," although "[c]ase law" indicated that "the paperwork [was] not privileged." Verner responded with a hand-written note telling her that these documents had "NOT" been "turned over to DAs offices yet."

Despite this withholding of the mental health worksheets from the District Attorneys (and later from Penate and the Hampden County Superior Court), Kaczmarek did disclose the worksheets to Farak's defense attorney. In doing so, Kaczmarek told the defense that the documents would not be turned over to any "Farak defendants" (that is, defendants seeking relief based on Farak's misconduct) and that the AG's office considered the documents to be "privileged."

Penate, who was awaiting his trial on the criminal charges, filed a motion to dismiss in July 2013 based on the charges against Farak. The judge ordered an evidentiary hearing on the issue of Farak's misconduct between November 2011 and January 2012, when the lab had custody of the substances from Penate's case. Penate's motion was consolidated with similar motions from about a dozen Farak-defendant cases pending in Hampden County Superior Court. A hearing in these consolidated motions

on the timing and scope of Farak's misconduct was scheduled for September 9, 2013.

Before the hearing, Assistant District Attorney Eduardo Velazquez, who was prosecuting Penate, sought any exculpatory evidence for the hearing from the AGO. He was told that all relevant evidence had already been provided to the DAs, even though the mental health worksheets, as Verner had noted, had "NOT" been disclosed.

Ballou received a subpoena duces tecum for the hearing on the consolidated motions "command[ing] the production of all documents and photographs pertaining to the investigation of Sonja Farak and the Amherst Drug Lab."[3] Assistant Attorney General Kris Foster, from the AGO's Appeals Division, was assigned to handle the response to the subpoena. In meetings about how to respond to the subpoena, Kaczmarek divulged to Foster and Foster's supervisor, Randall Ravitz, that she and Ballou possessed the mental health worksheets. But Kaczmarek took the position that these documents were irrelevant to the Farak defendants. She also

---

[3] Before Penate's motion was consolidated with the other Farak defendants' motions, Penate served Ballou and Kaczmarek with subpoenas to testify at the evidentiary hearing ordered in Penate's case. However, the complaint does not allege that Kaczmarek was subpoenaed to appear at the post-conviction proceeding. The allegations in the complaint about Kaczmarek recounted in the following paragraphs all pertain to the Ballou subpoena and a related court order.

urged that the documents should not be produced because several contained information about Farak's mental health treatment.

Foster filed a motion to quash the subpoena. In the alternative, Foster sought a protective order excluding from the scope of the subpoena information including "emails responsive to the subpoena" and "information concerning the health or medical or psychological treatment of individuals."

Ballou testified at the hearing on the consolidated motions. At Foster's instruction, Ballou did not reveal the existence of the mental health worksheets. During the hearing, the judge ordered Foster to review Ballou's "file" on Farak and to present to the court for in camera review copies of any undisclosed documents in the file.

Foster, Kaczmarek, and Verner discussed whether the order required Ballou to submit his emails to Kaczmarek about Farak. Kaczmarek ultimately asked Ballou to bring his file about the case to Boston for her to review. The paper file Ballou brought to Boston contained none of the mental health worksheets, so Kaczmarek told Foster that all of the documents in Ballou's file had already been disclosed. Foster then sent the judge a letter stating that "every document in [Ballou's] possession has already been disclosed."

The day Foster sent the letter, Penate's counsel emailed Foster requesting to inspect the documents seized from Farak's

car. Foster forwarded the email to Kaczmarek, who responded: "No. Why is this relevant to this case. I really don't like him." Foster told Penate's counsel that the AG's position was that the evidence from the car was irrelevant to any case other than Farak's.

Penate's motion to dismiss the criminal charges was denied by the state court based on a finding that Farak's misconduct began after she handled the samples in Penate's case. Although Penate subpoenaed Kaczmarek to testify at his trial, Foster's motion to quash the subpoena was granted, as was Velazquez's motion in limine to preclude Penate from arguing that Farak was engaged in misconduct between November 2011 and January 2012. In December 2013, Penate was convicted of one count of Distributing a Class A substance and was sentenced to five to seven years in prison.

In October 2014, an inspection of the evidence found in Farak's car for a different Massachusetts criminal case revealed the Diary Card and the other mental health worksheets. This discovery prompted Verner, the head of the AG's Criminal Bureau, to send copies of all of the documents seized in the car to the Massachusetts DAs in November 2014.

Based on the newly produced evidence, Penate filed a motion for a new trial in 2015, which was again consolidated with the cases of other Farak defendants. These defendants sought

discovery from the AGO on prosecutorial misconduct by attorneys in that office. In opposing the discovery, the AGO represented:

> The defendants' proposed claim of prosecutorial misconduct based on actions by the Attorney General's Office fails for the very simple fact that the AGO is not the prosecutor of any of these cases. Certainly, the AGO prosecuted Sonja Farak; but this is not Farak's case. Instead, in these cases the AGO was a non-party from which the defendants previously sought expansive post-conviction discovery. In that capacity, the AGO was well supported by case law in presenting arguments opposing the proposed discovery requests, just as any other non-party might do.

In January 2017, Penate's motion for a new trial was allowed, with the assent of the Hampden County DA. In June 2017, a judge dismissed Penate's conviction with prejudice. The judge found that "Kaczmarek's and Foster's deliberate withholding of exculpatory evidence was particularly egregious in the Penate case" and "qualifies as a fraud upon the court."

B.  History of this Suit

Penate filed this suit on September 5, 2017 in federal district court in Massachusetts. His complaint asserted two claims against Kaczmarek: the § 1983 claim already mentioned and a state tort law claim for intentional infliction of emotional distress. Under Massachusetts law, Kaczmarek's immunity from the tort claim falls with her immunity from the § 1983 claim.[4] See

_____

[4]     Kaczmarek's opening brief on appeal argues in a single paragraph that the tort claim is also "barred by the general

- 12 -

<u>Chicopee Lions Club</u> v. <u>Dist. Att'y for Hampden Dist.</u>, 485 N.E.2d 673, 677 (Mass. 1985).

Count IV of the complaint asserts § 1983 violations by Kaczmarek, Foster, and Foster's supervisor, Ravitz.  It alleges that Kaczmarek knew that the mental health worksheets were exculpatory evidence in the cases of Farak defendants like Penate and that Kaczmarek had a duty under <u>Brady</u> v. <u>United States</u>, 373 U.S. 83 (1963), to disclose such evidence and to make truthful statements about such evidence.  In paragraph 433, the complaint states that Kaczmarek, Foster, and Ravitz, "prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed <u>Brady</u> material, lied about, and otherwise failed to disclose <u>Brady</u> material to the Hampden County ADA prosecuting Plaintiff."  Paragraph 434 alleges the same failure to disclose, to "Plaintiff's counsel and the Hampden County Superior Court."[5]  Count VIII

---

Massachusetts common law litigation privilege."  But Kaczmarek did not raise this defense in the district court, the magistrate judge did not rule on it, and we do not consider it.  See <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990); see also <u>Espinal-Dominguez</u> v. <u>Puerto Rico</u>, 352 F.3d 490, 495-96 (1st Cir. 2003) (describing the scope of appellate jurisdiction from non-final district court orders).

[5]     In the order denying Kaczmarek's motion to dismiss, the magistrate judge recounted the complaint's allegations that Kaczmarek conspired with investigators to mischaracterize the mental health worksheets as "lab paperwork" and that Kaczmarek discouraged Ballou from following up on a lead.  See <u>Penate</u>, 2018 WL 6437077, at *14.  To the extent these allegations are offered to support a claim that Kaczmarek violated Penate's constitutional

alleged that this conduct by Kaczmarek amounted to the intentional infliction of emotional distress.

Kaczmarek's motion to dismiss the complaint argued that she was entitled to absolute immunity, raising the two theories previously identified. The magistrate judge denied the motion because Penate's claims against Kaczmarek were "not related to her prosecution of Farak," Penate, 2018 WL 6437077, at *16, and because Kaczmarek was not engaged in a function analogous to a prosecutor's when she worked on the requests for exculpatory information in the AG's and Ballou's possession, see id. at *15.

II.

A.   Jurisdiction, Standard of Review, and Kaczmarek's Burden

We have jurisdiction over Kaczmarek's interlocutory appeal from the denial of immunity because it "turns on a purely legal question." Limone v. Condon, 372 F.3d 39, 50 (1st Cir. 2004); see also Filler v. Kellett, 859 F.3d 148, 152 (1st Cir.

_____

rights by artificially narrowing the scope of the investigation against Farak, we have held, in footnote 2, supra, that Kaczmarek is absolutely immune.

Penate argues in his brief that these factual allegations were made in support of paragraph 433 of the complaint, which alleges that Kaczmarek failed to disclose exculpatory evidence to the DAs, including to the DA prosecuting Penate. And Kaczmarek admits in her reply brief that these allegations could properly be used to support the theory in paragraph 433. To the extent the facts are alleged for this purpose, we agree with Penate that these two factual allegations are well-pleaded and need not be disregarded as conclusory. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011) (defining well-pleaded facts).

- 14 -

2017) (lacking interlocutory jurisdiction because immunity depended on facts requiring further development). Penate's complaint alleges the facts necessary to evaluate Kaczmarek's defense; we are required to take those facts as true at this stage; and Kaczmarek, in any event, does not dispute them. The only question is whether, on those facts, Kaczmarek is entitled to absolute immunity and thus to dismissal of the complaint.

Our review is de novo. Garnier v. Rodríguez, 506 F.3d 22, 26 (1st Cir. 2007). We start with "[t]he presumption . . . that qualified rather than absolute immunity is sufficient." Burns v. Reed, 500 U.S. 478, 486 (1991). And Kaczmarek, as the "official seeking absolute immunity[,] bears the burden of showing that such immunity is justified." Id. at 486. That burden is a heavy one. See, e.g., Buckley, 509 U.S. at 269 ("[W]e have been 'quite sparing' in recognizing absolute immunity for state actors . . . ." (quoting Forrester v. White, 484 U.S. 219, 224 (1988)).

Kaczmarek has not satisfied it here, either on her first theory that she is entitled to absolute prosecutorial immunity because she prosecuted Farak or on her second theory that she should enjoy the absolute immunity afforded to certain government attorneys. We address these theories in turn.

B.    Absolute Prosecutorial Immunity

The Supreme Court first recognized the absolute immunity of prosecutors from certain § 1983 claims in Imbler v. Pachtman,

- 15 -

424 U.S. 409 (1976). There, the Court held that prosecutors are absolutely immune in exercising the core prosecutorial functions of "initiating a prosecution and . . . presenting the State's case." Id. at 431.

Following Imbler, the Court has used a "functional approach" to decide whether state officials are entitled to absolute immunity from particular § 1983 claims. Burns, 500 U.S. at 486. This approach looks to "the nature of the function performed, not the identity of the actor who performed it," Forrester, 484 U.S. at 229, nor to "the particular act" in isolation, Mireles v. Waco, 502 U.S. 9, 12 (1991) (per curiam) (citing Stump v. Sparkman, 435 U.S. 349, 356 (1978)).

Applying this approach, the Supreme Court has recognized that several "functions of contemporary prosecutors are entitled to absolute immunity." Buckley, 509 U.S. at 269. These include: "appearing before a judge and presenting evidence in support of a motion for a search warrant," Burns, 500 U.S. at 491, and "prepar[ing] and filing . . . [a criminal] information and [a] motion for an arrest warrant," Kalina v. Fletcher, 522 U.S. 118, 129 (1997). The basic "principle" of these cases is "that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." Buckley, 509 U.S. at 273.

- 16 -

But the Supreme Court has rejected claims to absolute prosecutorial immunity where the prosecutor's conduct lacked a "functional tie to [a] judicial process" initiated by the prosecutor. Id. at 277. So, absolute immunity does not protect prosecutors when they give advice to police during a criminal investigation, Burns, 500 U.S. at 495-96, fabricate evidence long before a grand jury has made an indictment, Buckley, 509 U.S. 275-76, or make statements to the press in announcing an indictment, id. at 276-78. These functions have been deemed "administrative" or "investigative," and, in exercising them, "a prosecutor is in no different position than other executive officials," such as police, and "qualified immunity is the norm for them." Id. at 278.

All of these Supreme Court cases involved claims arising out of criminal proceedings which were initiated by the same officials who were seeking absolute prosecutorial immunity. But Kaczmarek was not Penate's prosecutor;[6] she rests her broad assertion of absolute prosecutorial immunity on her role as Farak's prosecutor. Kaczmarek's claim is thus a novel one, as neither the

_____

[6] Kaczmarek's agency, the AGO, had no control over Penate's prosecution and thus Kaczmarek cannot, and indeed does not, claim to have been his prosecutor. See Kulwicki v. Dawson, 969 F.2d 1454, 1467 (3d Cir. 1992) (denying prosecutor lacking "official control over" a prosecution prosecutorial immunity based on that prosecution). Indeed, the AG, for whom Kaczmarek worked, admitted that it was not Penate's prosecutor but rather "was a non-party from which [Penate] . . . sought . . . discovery."

- 17 -

Supreme Court nor this court has ever extended absolute prosecutorial immunity to conduct by a prosecutor in a proceeding not initiated by that prosecutor or by an office that prosecutor supervises.[7]

Absolute immunity is not triggered here by the simple fact that the conduct alleged in the complaint occurred while Kaczmarek was pursuing the commonwealth's criminal charges against Farak. See Filler, 859 F.3d at 153 ("Importantly, absolute immunity does not necessarily apply to all actions that a prosecutor may take once the 'judicial phase' begins."); Guzman-Rivera, 55 F.3d at 29 (observing that absolute prosecutorial immunity does not "extend[] to all conduct that facilitates the prosecutorial function"). As the Supreme Court has emphasized, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." Buckley, 509 U.S. at 273. Rather, under the functional approach, Kaczmarek's defense turns on the following question: was Kaczmarek functioning as Farak's prosecutor when she withheld evidence from Penate's proceeding? See id. at 277 (asking whether the prosecutor's

---

[7] The Supreme Court held in Van de Kamp v. Goldstein, 555 U.S. 335 (2009), that prosecutors were entitled to absolute immunity for supervising their office's compliance with constitutional disclosure requirements. Id. at 348. As Kaczmarek did not work in or otherwise have control over the office of the DA prosecuting Penate, her claim to absolute prosecutorial immunity does not come under the rubric of Van de Kamp. See id. at 345.

conduct had any "functional tie to the judicial process"); <u>Burns</u>, 500 U.S. at 495 (asking whether "the prosecutor's actions are closely associated with the judicial process" the prosecutor initiated).

Key facts alleged in the complaint answer that question in the negative. The most significant fact is that Kaczmarek turned over the mental health worksheets to Farak's defense. This shows that, when Kaczmarek orchestrated the withholding of that very same evidence in Penate's case, she did not do so because keeping the evidence under wraps was helpful to her prosecution of Farak. On the complaint's facts, we conclude jurors could find that Kaczmarek's decisions about disclosure of evidence in Penate's case were not made based on her role as Farak's prosecutor. The absence of this "functional tie" between Kaczmarek's prosecutorial duties and her conduct in Penate's case, if proven, would doom Kaczmarek's assertion of absolute prosecutorial immunity. <u>Buckley</u>, 509 U.S. at 277.

The ties Kaczmarek points to do not show that she withheld evidence in Penate's case as part of her advocacy in Farak's case. Kaczmarek emphasizes that her involvement in Penate's case occurred "in the midst of her criminal prosecution" of Farak. But, as we have already explained, the functional approach and the principle that prosecutorial immunity is not coextensive with the judicial phase of the criminal process require

that determinations about immunity turn not on accidents of timing but on careful analyses of the functions being performed.

Kaczmarek also stresses that her "obligations" to Penate "arose solely because of her . . . role as Farak's prosecutor." Kaczmarek possessed the evidence at issue because she was Farak's prosecutor, "but that connection is too tenuous" to show that Kaczmarek functioned as a prosecutor when she withheld the evidence from Penate's case.  Lampton v. Diaz, 639 F.3d 223, 227 (5th Cir. 2011); see also id. at 227-28 (denying immunity for prosecutor's disclosure of tax records acquired during prosecution to state ethics board); Yarris v. Cty. of Delaware, 465 F.3d 129, 137-38 (3d Cir. 2006) (denying absolute prosecutorial immunity to prosecutors who withheld evidence in post-conviction proceedings assigned to other prosecutors, even though the prosecutors had acquired the evidence at issue through their roles as prosecutors in the initial criminal proceedings); Guzman-Rivera, 55 F.3d at 29 ("The prosecutorial nature of an act does not spread . . . like an inkblot, immunizing everything it touches.").

Kaczmarek's final attempt to cast her function in Penate's case as entitled to prosecutorial immunity, based on Reid v. New Hampshire, 56 F.3d 332 (1st Cir. 1995), misses because it trains its sights on Kaczmarek's conduct rather than on her function.  The prosecutors in Reid enjoyed absolute immunity from claims that they intentionally withheld evidence while trying the

plaintiff on criminal charges.  Id. at 337; see also Campbell v. Maine, 787 F.2d 776, 778 (1st Cir. 1986) (per curiam) (same). Kaczmarek argues that she is entitled to immunity just the same because, like the prosecutors in Reid, she "used her discretion to evaluate" the evidence at issue and to determine that the evidence was "irrelevant" to Penate.

But Reid explained that absolute immunity attaches "when a prosecutor evaluates evidence and interviews witnesses in preparation for trial," 56 F.3d at 337 (citing Buckley, 509 U.S. at 273), and that one aspect of this immunity-protected function is "determin[ing] what evidence . . . [i]s exculpatory and subject to disclosure" to the defense, id.; see also Warney v. Monroe Cty., 587 F.3d 113, 125 (2d Cir. 2009) ("[T]he disclosure of [Brady] evidence to opposing counsel is an advocacy function."); Imbler, 424 U.S. at 431 n.34 (analogizing withholding exculpatory evidence to a prosecutor's use of perjured testimony during trial).  Reid's holding thus rested not on "the act itself" -- analyzing potentially exculpatory evidence -- but on "the nature and function of the act" -- analyzing evidence in preparation to present the state's case.  Mireles, 502 U.S. at 13 (internal quotation marks omitted); see also Buckley, 509 U.S. at 276 n.7 (confirming that immunity for "obtaining, reviewing, and evaluating evidence" depends on whether those actions were taken in an "administrative" or prosecutorial capacity (quoting Imbler, 424 U.S. at 431 n.33)).

- 21 -

That police are afforded qualified immunity from <u>Brady</u> claims further illustrates that the function for which the evidence is analyzed, not the act of analyzing potentially exculpatory evidence, controls the type of immunity. See <u>Drumgold</u> v. <u>Callahan</u>, 707 F.3d 28, 38 (1st Cir. 2013) (denying claim of qualified immunity by police officer for suppression of evidence). Indeed, the operative allegations in Count IV of the complaint allege that Kaczmarek withheld <u>Brady</u> material, as a police officer might, by "concealing <u>Brady</u> material," from the court where Penate was tried and from Penate's prosecutor.

Finally, the functional tie present in <u>Reid</u> is absent here: we have already concluded that Kaczmarek's decisions to withhold evidence in Penate's case were not, on the facts alleged, an aspect of her preparation to present the state's case against Farak. In short, Kaczmarek does not enjoy absolute prosecutorial immunity from Penate's suit because of her role as Farak's prosecutor.

C.   Absolute Immunity of Government Attorneys

The next issue is Kaczmarek's theory that she enjoys absolute immunity because she was a government attorney performing an advocacy function when she advised Foster on the AGO's responses to the Ballou subpoena and to the subsequent court order requiring disclosure of documents.

This theory of immunity is derived from Butz v. Economou, 438 U.S. 478 (1978), which held that "agency officials" enjoy absolute immunity in "performing certain functions analogous to those of a prosecutor," including "initiat[ing] administrative proceedings" and "presenting evidence in an agency hearing." Id. at 515-16. Butz itself involved claims against, among others, a Department of Agriculture attorney who had brought an administrative enforcement proceeding against the plaintiff. Id. at 482.

Kaczmarek cites to out-of-circuit cases extending Butz to officials appointed to initiate civil proceedings for the government or to defend the government in civil proceedings.[8] See, e.g., Schrob v. Catterson, 948 F.2d 1402, 1413 (3d Cir. 1991) (initiating a civil forfeiture proceeding)); Murphy v. Morris, 849 F.2d 1101, 1105 (8th Cir. 1988) (defending government in a civil suit); Barrett v. United States, 798 F.2d 565, 572-73 (2d Cir. 1986) (same).[9] She argues that these cases and Butz hold that

---

[8] This circuit has not extended Butz to government attorneys outside the administrative context. We have granted absolute immunity to, for example, members of a state medical licensing board in initiating a licensure revocation proceeding, Wang v. N.H. Bd. of Registration in Med., 55 F.3d 698, 701 (1st Cir. 1995), and to officers at a state insurance bureau in deciding to settle a violation through consent agreement rather than administrative proceeding, Knowlton v. Shaw, 704 F.3d 1, 6 (1st Cir. 2013).

[9] Kaczmarek likens herself to state government attorneys granted immunity by the Second Circuit in Barrett for their

"government attorneys who are not formally designated as prosecutors are also entitled to absolute immunity when their function is intimately associated with the judicial process." That reading is undoubtedly too broad. Butz involved agency attorneys with assigned roles in a quasi-judicial administrative proceeding. And the out-of-circuit cases involved attorneys appointed to represent the government in initiating or defending a civil proceeding. No case has extended absolute immunity to a government attorney like Kaczmarek for merely assisting, behind the scenes, in a state's response to a court request for documents. And we do not believe that such an extension is "necessary to protect the judicial process." Burns, 500 U.S. at 485.

But, even assuming that Butz immunity were as broad as Kaczmarek argues it is, her theory would fail on its own terms. The facts alleged in the complaint do not support it. See Odd v. Malone, 538 F.3d 202, 208 (3d Cir. 2008) (emphasizing the "fact-intensive nature" of the functional approach to absolute immunity).

To recap the basic events, the subpoena duces tecum received by Ballou "command[ed] the production of all documents

assignment to defend the state in a civil suit filed in state court. 798 F.2d at 573. But that holding does not encompass Kaczmarek's claim to immunity. As we have already explained, Kaczmarek did not represent the DA in the Penate prosecution. And, as we will explain, Kaczmarek was not the AGO's designee to respond to the discovery requests.

- 24 -

and photographs pertaining to the investigation of Sonja Farak and the Amherst Drug Lab." Later, the judge ordered Ballou to produce any previously undisclosed evidence in his file. Foster was the AGO attorney responsible for handling the AGO's answers to the subpoena and court order. She had conversations with Kaczmarek and others in the course of formulating these responses.

As we read the core facts alleged in the complaint, in these conversations with Foster, Kaczmarek primarily functioned as a custodian of evidence. This is an administrative function not "analogous" to the advocacy of a prosecutor, Butz, 438 U.S. at 515, nor otherwise intimately associated with the judicial process,[10] see Odd, 538 F.3d at 213 (denying claim of absolute immunity for a "primarily administrative" function); see also, e.g., Knowlton v. Shaw, 704 F.3d 1, 5 (1st Cir. 2013) ("Absolute immunity . . . is not available to . . . officials whose actions are primarily administrative . . . ."); Perez v. Ellington, 421 F.3d 1128, 1133 (10th Cir. 2005) ("Absolute immunity does not

---

[10] Kaczmarek also argues, relying on Van de Kamp, that she is absolutely immune because she advised Foster, whom the district court found to be absolutely immune, see Penate, 2018 WL 6437077, at *14. Van de Kamp, however, granted immunity to supervisors of prosecutors and to the prosecutor's "colleagues" who shared an "intimate[] association with the judicial phase of the criminal process." See 555 U.S. at 345-46. Kaczmarek was not Foster's supervisor. And our conclusion that Kaczmarek could be found not to have shared such an association with the judicial phase of the criminal process distinguishes her from the hypothetical colleagues the Supreme Court deemed immune in Van de Kamp.

extend to actions 'that are primarily investigative or administrative in nature' . . . ." (quoting Pfeiffer v. Hartford Fire Ins. Co., 929 F.2d 1484, 1490 (10th Cir. 1991)).

That Kaczmarek acted as an evidence custodian is consistent first of all with the AG's own description of its role in Penate's proceeding. The AGO represented to the state court evaluating Penate's motion for a new trial that the AG was "not the prosecutor" of Penate's case. Instead, the AG stated that, in responding to the subpoena and court order, it had been a "non-party from which the defendants . . . sought . . . discovery." "In that capacity," the AGO claimed to have acted "as any other non-party might." Our characterization of Kaczmarek's function follows from this admission by the AG that it was "not the prosecutor" but rather a non-party simply providing requested evidence.

Other key facts alleged confirm this characterization as to Kaczmarek herself. Kaczmarek's role in the AG's Enterprise and Major Crimes Unit was to prosecute crimes. A different unit, the Appeals Division, where Foster worked, handled the AGO's responses to subpoenas. Kaczmarek, in other words, was involved in the response to the subpoena and court order only because she was the person familiar with the materials requested. The complaint thus alleges that Kaczmarek's primary role was to inform Foster about

the existence, or non-existence, of responsive documents among those materials.

In performing this role, Kaczmarek "serv[ed] the same non-adversarial function as police officers . . . and other clerical state employees" able to identify and describe evidence in government possession. Yarris, 465 F.3d at 138 (holding that former prosecutors who stonewalled requests to test evidence acted not like prosecutors entitled to absolute immunity but as "custodian[s] of evidence"). This function, whether performed by a government lawyer like Kaczmarek or by a police officer, is an administrative one, not analogous to the advocacy of a prosecutor, nor otherwise closely associated with the judicial process. See id. at 137-38.

The administrative nature of this role here is further apparent in the nature of the subpoena and order. The subpoena requested all relevant documents and the order any previously undisclosed documents. Informing Foster whether documents responsive to such explicit orders existed among the Farak materials did not require advocacy by Kaczmarek. In this, our view is consistent with Odd v. Malone, 538 F.3d at 213 (Hardiman, J.), which held that a prosecutor responsible for "informing the court about the status of a detained witness" was performing an administrative function. Id. at 213. There, too, the function's administrative nature was "especially" clear "in light of" the

fact that the court's order requesting the information was "explicit." Id.

To the extent Kaczmarek did use discretion or legal knowledge in advising Foster, that does not change our conclusion that Kaczmarek's primary function was an administrative one not entitled to absolute government attorney immunity. As we explained in the previous section, it is the function for which evidence is evaluated, not the act of analyzing evidence itself which controls the type of immunity. And, here, the complaint alleges that Kaczmarek's primary function in analyzing the Farak materials was an administrative one -- to inform Foster whether those materials were responsive.

III.

The district court's denial of the motion to dismiss is affirmed.