# United States Court of Appeals
## For the First Circuit

No. 19-1187

ROLANDO PENATE,

Plaintiff, Appellee,

v.

JAMES HANCHETT,

Defendant, Appellant,

ANNE KACZMAREK; KRIS FOSTER; RANDALL E. RAVITZ; JOSEPH BALLOU;
ROBERT IRWIN; RANDY THOMAS; SONJA FARAK; SHARON SALEM; JULIE
NASSIF; LINDA HAN; ESTATE OF KEVIN BURNHAM; STEVEN KENT; JOHN
WADLEGGER; GREGG BIGDA; EDWARD KALISH; and CITY OF SPRINGFIELD,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Katherine A. Robertson, U.S. Magistrate Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Joshua D. Jacobson, Assistant Attorney General, with whom
Maura Healey, Attorney General of Massachusetts, and Adam
Hornstine, Assistant Attorney General, were on brief, for
appellant.
Luke Ryan, with whom Sasson, Turnbull, Ryan & Hoose was on
brief, for appellee.

December 13, 2019

**LYNCH**, **Circuit Judge**.  This appeal raises issues under the clearly established law prong of the qualified immunity test for supervisory state officials.  A magistrate judge concluded that a state drug lab supervisor, defendant-appellant James Hanchett, is not entitled to qualified immunity from a claim brought by plaintiff-appellee Rolando Penate under 42 U.S.C. § 1983.  The claim alleged that Hanchett's inadequate supervision of a drug lab chemist constituted deliberate indifference to Penate's constitutional rights.  The magistrate judge denied Hanchett's motion to dismiss that claim.  Penate v. Kaczmarek, No. 3:17-30119-KAR, 2019 WL 319586, at *12-13 (D. Mass. Jan. 24, 2019).  This ruling was in error, and we reverse and direct entry of dismissal on the § 1983 claim.

We also vacate and remand the denial of Hanchett's motion to dismiss an intentional infliction of emotional distress state law claim, as our qualified immunity ruling eliminates the sole basis for asserting federal jurisdiction over that claim.

I.

A.  Facts Alleged in the Complaint

"We accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party."  Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc., 920 F.3d 111, 114 (1st Cir. 2019) (alterations and internal quotation marks omitted) (quoting Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir.

2009)).  Facts are drawn from the complaint, and, where not in conflict with the complaint's factual allegations, from the decision in Commonwealth v. Cotto, No. 2007770, 2017 WL 4124972 (Mass. Super. Ct. June 26, 2017), which was referenced in the complaint and relied on by the magistrate judge and both parties in this appeal.  See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 471 & n.2 (1st Cir. 2012) (en banc).

From the 1960s until July 2012, the Massachusetts Department of Public Health ("DPH") operated the Amherst Drug Lab (the "Lab") on the campus of the University of Massachusetts. Massachusetts State Police assumed operation of the Lab from July 2012 until the Lab closed on January 18, 2013.  The Lab analyzed samples submitted by law enforcement agencies in the Commonwealth to determine whether the samples contained controlled substances.

Chemists at the Lab tested thousands of samples a year. For example, in the 2011 fiscal year, three chemists working in the Lab each tested an average of 2,052 samples.  The Lab's chemists, as part of their analyses, regularly compared testing results from the unknown samples against results from known drug "standards" using a Gas Chromatographer/Mass Spectrometer.  After they completed their analyses, the chemists created and signed drug certificates certifying that the drug sample contained a controlled substance.  They also sometimes testified in court.

- 4 -

Sonja Farak was hired by DPH in July 2003 as a drug lab chemist. In 2004, she was transferred to the Amherst Lab where Hanchett worked. That same year, she started stealing and abusing on a near-daily basis the methamphetamine oil that the Lab kept in an opaque bottle as a standard. The Lab's supervisor at that time apparently did not catch these thefts by Farak. Like Farak, Hanchett was also then a chemist employed at the Amherst Drug Lab.

In 2008, Hanchett was promoted to be the Lab's supervisor. As supervisor, he did not often engage in direct oversight of the three other employees at the Lab. The complaint alleges Hanchett did not retest samples to ensure the accuracy of chemists' results, observe chemists during the testing process, review chemists' notebooks, audit the evidence stored at the Lab, or initiate any conversations with his staff about Lab procedures. He also never gave Farak or the other chemists any formal performance evaluations. The Lab was understaffed and underfunded, and in these difficult conditions, Hanchett relied on his "trusted employees" to work largely unsupervised.

Soon after Hanchett was promoted, Farak overheard him talking about an audit he was planning to perform of the Lab's supplies. She realized that, after her almost four years of stealing, the Lab's supply of methamphetamine oil was substantially depleted. Farak added water to the oil to cover up her drug use. During the 2008 audit, Hanchett noticed the sample's

- 5 -

strange appearance but "surmised that the drug was just degrading." After this, Farak started stealing and using the Lab's other drug standards, including amphetamine, phentermine, ketamine, cocaine, ecstasy, marijuana, and LSD.

By at least April of 2009, Farak had expanded from stealing standards to a new source of drugs. She started taking and using a portion of the drugs from some of the samples that had been submitted by law enforcement officers for testing. To facilitate these thefts, she would sometimes partially disable the machine in the Lab that heat-sealed evidence bags, which allowed her to break the seals more easily and steal from the drugs within.

At least twice in 2010, she expressed concern to her therapist that her co-workers might suspect her drug abuse. By the fall of 2011, she was heavily addicted to crack cocaine, smoking the drug more than ten times a day, including at the Lab.

It was during this period, the fall of 2011, that samples from the substances Penate allegedly sold to an undercover police officer were assigned to Farak for testing. She reported testing the Penate drug samples on December 22, 2011, January 6, 2012, and January 9, 2012. She reported that they were positive for the presence of a controlled substance and signed the drug certificates in Penate's case. The samples were returned to the state police on January 11, 2012. On February 1, 2012, prosecutors presented Farak's drug certificates to the grand jury, which relied on them

to indict Penate. No one else, including Hanchett, reviewed or confirmed her work on these samples.

It is not specifically alleged that Farak took any of the Penate drug samples for her own use, but it appears she did use other police-submitted drugs during the period in which she was testing Penate's samples. On December 22, 2011, she wrote on a diary card she was keeping as part of her treatment for drug addiction: "tried to resist using @ work but ended up failing." Penate's § 1983 complaint alleges that on January 9, 2012 (the day of her last test of the Penate samples), Farak smoked crack cocaine in the morning, stole LSD from a police-submitted sample (unrelated to Penate's criminal case), and then "spen[t] the remainder of her work day hallucinating."

The complaint further alleges that, because Farak was abusing drugs, Farak handled Penate's samples improperly, possibly resulting in the return of items Penate "was not charged with distributing or possessing." When the samples in Penate's case were returned to the officer who brought them to the Lab, they no longer matched the descriptions on the evidence tags. Most significantly, an unexplained packet labeled "MOONWALK" was improperly included among the materials that were returned.

Events after Farak had tested the Penate drug samples led to her undoing. By April of 2012, months after she had done the testing of the Penate samples, Farak was stealing from an

increasing number of police-submitted samples. In the summer of 2012, she began stealing from samples assigned to other chemists in the Lab, including Hanchett, who not only acted as supervisor then but also had his own samples to test. Several times that year, Farak manufactured crack cocaine from powdered cocaine at the Lab for her personal use. At unknown times throughout her employment at the Lab, Farak's drug abuse caused her to hallucinate, "to experience what she described as 'ridiculously intense cravings,' to feel like her mind was racing, and to take frequent breaks from work to use drugs."

Also in the summer of 2012, the misconduct of another DPH chemist, Annie Dookhan, employed at a different DPH drug lab, came to light. In response, Hanchett did a second audit of the Lab's standards and found that many were at much lower levels than anticipated or were missing altogether. He spoke with another chemist in the Lab about the possibility of wrongdoing but did not otherwise act on his findings. Although he had an obligation as the holder of a federal license "to make a report of any missing narcotics at his lab," he did not do so.

A year after the Penate tests, in early January 2013, Farak made crack cocaine at the Lab. Hanchett found a leftover beaker with a white residue on it. He confronted Farak, she denied knowing anything about it, and he, in the face of that denial,

mistakenly "decided another coworker must have brought her daughter to the lab and did a science experiment."

Within a few weeks of the beaker incident, on January 18, 2013, another employee at the Lab told Hanchett that two cocaine samples assigned to Farak were missing. That employee and Hanchett found the samples, cut open, in a manila envelope. Hanchett called the state police that day, setting off a rapid investigation that ultimately led to the termination of Farak's employment and state criminal charges against Farak. Farak pleaded guilty on January 6, 2014 to multiple counts of evidence tampering, larceny of controlled substances from a dispensary, and unlawful possession of a Class B substance.

On July 15, 2013, after knowledge of Farak's drug abuse became public but before she was convicted, Penate moved to dismiss the charges against him. The Hampden County Superior Court denied Penate's motion, finding, based on the evidence available at the time, that Farak's misconduct postdated her testing of Penate's samples.

Penate's state criminal case went to trial on December 9, 2013. His lawyer tried to make government misconduct a central part of Penate's defense, but he was limited in his ability to do so by a series of unfavorable rulings. The Commonwealth did not rely on Farak's test results and instead introduced test results done on August 8, 2013 by a chemist at a different lab that showed

that the substances Penate allegedly sold to undercover police officers were, in fact, heroin. On December 13, 2013, Penate was convicted of a single count of distributing a Class A substance. He was sentenced to five to seven years in state prison.

When the fuller scope of Farak's drug abuse came to light, Penate moved for a new trial on May 21, 2015. On June 26, 2017, Penate's conviction was vacated, his indictment was dismissed with prejudice,[1] and he was released from prison the next day. See Cotto, 2017 WL 4124972, at *46-47.

B.    History of the Federal § 1983 Suit

Penate brought this lawsuit on September 5, 2017 under § 1983 against the City of Springfield and officials from DPH, the Massachusetts State Police, the Attorney General's Office of the Commonwealth, and the Springfield Police Department, along with a pendent state law claim against all the individual defendants for

---

[1]    The full scope of Farak's drug abuse was not discovered until October 30, 2014. A Superior Court judge had previously determined that there was no evidence Farak engaged in misconduct prior to July 2012. At that time, Assistant Attorney Generals Anne Kaczmarek and Kris Foster had withheld exculpatory evidence that strongly suggested Farak's drug abuse went back at least six months prior to July 2012, including the time period in which Farak tested Penate's drug samples. See Penate v. Kaczmarek, 928 F.3d 128, 131-34 (1st Cir. 2019). The Superior Court order that vacated the conviction found that Kaczmarek and Foster's misconduct, apart from Farak's misconduct, provided three independent bases for dismissing Penate's indictment with prejudice: they committed a "fraud upon the court," caused Penate to be "irremediably prejudiced," and caused Penate "irremediable harm." Cotto, 2017 WL 4124972, at *47.

- 10 -

intentional infliction of emotional distress. Most of the defendants moved to dismiss, and the magistrate judge[2] granted some of the motions.[3]

Specifically as to Hanchett, Penate alleged that Hanchett had supervisory liability under § 1983 because he was "deliberately indifferent" to Penate's constitutional due process rights by "providing insufficient training, failing to properly supervise chemists, . . . failing to implement policies to ensure quality of work product and compliance with chain of custody measures, and failing to safeguard the evidence submitted to the lab for chemical analysis." Penate also alleged that Hanchett, along with all of the other defendants, engaged in "extreme and outrageous" conduct that qualified as intentional infliction of emotional distress.

The magistrate judge denied Hanchett's motion to dismiss the § 1983 claim on the basis that the law was clearly established that state lab chemists and their supervisors have a duty under Brady v. Maryland, 373 U.S. 83 (1963), to disclose exculpatory evidence to the prosecutor. Penate v. Kaczmarek, 2019 WL 319586,

_____

[2] All parties consented to the case being assigned to a magistrate judge for all purposes including entry of final judgment. See 28 U.S.C. § 636(c).

[3] Another one of the defendants, Anne Kaczmarek, also appealed the magistrate judge's denial of her motion to dismiss. This court decided Kaczmarek's appeal in Penate's favor. See generally Kaczmarek, 928 F.3d 128. That appeal did not involve qualified immunity issues.

- 11 -

at *7-9. The magistrate judge extrapolated from that that Hanchett, as Farak's supervisor, "should have been on notice" that "willfully turning a blind eye to indications of evidence tampering by a lab chemist could be a basis for liability [under § 1983] to a defendant whose due process rights were violated." Id. at *12.

The magistrate judge found that this same behavior -- characterized as showing a disregard for "repeated red flags" -- was enough to state a claim for intentional infliction of emotional distress under state law because it was evidence of a "deliberate disregard of a substantial probability that his actions [would] produce severe emotional distress." Id. at *15 (alteration in original) (quoting Limone v. United States, 579 F.3d 79, 95 (1st Cir. 2009)). This timely appeal ensued.

II.

A.   Jurisdiction and Standard of Review

"[A] district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of [28 U.S.C.] § 1291" and is immediately appealable. Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009) (quoting Behrens v. Pelletier, 516 U.S. 299, 307 (1996)); see also Air Sunshine, Inc. v. Carl, 663 F.3d 27, 32 (1st Cir. 2011). We review the denial of a motion to dismiss de novo. Air Sunshine, Inc., 663 F.3d at 32. There are no material facts in dispute precluding the exercise of appellate jurisdiction on the

qualified immunity issue.  McCue v. City of Bangor, 838 F.3d 55, 61-62 (1st Cir. 2016).

B.   Qualified Immunity Framework

Qualified immunity provides defendant public officials "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); see also Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).

The qualified immunity inquiry proceeds with a now-familiar two-part test: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (quoting Maldonado, 568 F.3d at 269).

Courts need not engage in the first inquiry and may choose, in their discretion, to go directly to the second.  See, e.g., Eves v. LePage, 927 F.3d 575, 584 (1st Cir. 2019) (en banc). We do so here.

The "clearly established" inquiry itself has two elements.  MacDonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014).  "The first focuses on the clarity of the law at the time of the violation.  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's

constitutional rights." Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013) (internal citation omitted). The inquiry is context-dependent; rights cannot be established "as a broad general proposition." Reichle v. Howards, 566 U.S. 658, 665 (2012) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).[4]

This test is refined further in supervisory liability cases. The "clearly established" inquiry as to supervisors is bifurcated and is satisfied only when "(1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998). If the constitutional right and the availability of supervisory liability that underlie a plaintiff's § 1983 claim are both clearly established, the qualified immunity analysis "reduces to the test of objective legal reasonableness." Id. at 6. Under this latter test, we ask "whether, in the particular circumstances confronted by [the] appellant, [the] appellant should reasonably

_____

[4] The parties disagree about the date we should use for determining whether the law with respect to the Brady obligations of lab chemists and the attendant potential liability of lab supervisors was clearly established. Hanchett submits that we should look to the state of the law in 2012, while Penate would have us examine the legal landscape as of his trial in December 2013. That dispute is immaterial to our analysis.

have understood that his conduct jeopardized those rights," whether through deliberate indifference or otherwise.  Id. at 7. This question involves merits-like analysis but is analytically distinct and confined to the qualified immunity inquiry.  Id. at 6-7.

Although we harbor grave doubts about both propositions, we will assume, without deciding, that it was clearly established as early as 2012 that lab chemists could be held liable for withholding exculpatory evidence under Brady and that a deliberately indifferent lab supervisor could be held liable for Brady violations perpetrated by subordinate chemists.[5]  As in Camilo-Robles, then, our inquiry centers on whether Hanchett, under the specific facts alleged in this case, should have "understood that his conduct jeopardized" Penate's constitutional rights.  Id. at 7.  We hold that Hanchett is entitled to qualified immunity because, under the circumstances alleged, an objectively reasonable lab supervisor would not have discerned that his acts and omissions threatened to violate the constitutional rights of

---

[5]    The magistrate judge, in holding that it was clearly established at the time of the alleged violation that lab chemists had disclosure obligations under Brady and that deliberately indifferent lab supervisors could be held liable for chemists' Brady violations, relied heavily on non-binding decisions and decisions that postdate the alleged violation.  See Penate, 2019 WL 319586, at *7-9.  The focus of the clearly established law inquiry, however, must remain on "controlling authority" that existed at the time of the alleged constitutional violation.  See Eves, 927 F.3d at 583.

criminal defendants whose suspected narcotics were being tested at the Lab.

C.    Supervisory Liability

By 2013, certain general principles of where supervisory liability could and could not be imposed were clearly established. Supervisors cannot be held liable under a theory of respondeat superior.  Iqbal, 556 U.S. at 676; Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  Liability cannot rest on a defendant's position of authority alone. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir. 2011).  Nor is alleging mere negligence by a supervisor enough.  Ramos v. Patnaude, 640 F.3d 485, 490 (1st Cir. 2011).

As of 2013, several First Circuit cases had said liability for supervisors is only triggered under § 1983 if "a plaintiff can establish that his or her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012) (quoting Ocasio-Hernández, 640 F.3d at 16).

A plaintiff must allege a strong causal connection, or "an 'affirmative link between the behavior of a subordinate and the action or inaction of his supervisor . . . such that the supervisor's conduct led inexorably to the constitutional violation.'"  Feliciano-Hernández v. Pereira-Castillo, 663 F.3d

527, 533 (1st Cir. 2011) (omission in original) (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011)).

A supervisor "may be liable for the foreseeable consequences" of a subordinate's conduct if the supervisor "would have known of it but for his deliberate indifference or willful blindness."[6]  Camilo-Robles, 151 F.3d at 7 (quoting Maldonado-Denis, 23 F.3d at 582).  To establish deliberate indifference, a plaintiff must show "(1) grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk."  Id.

This test for liability draws on the long-established principle that "[n]otice is a salient consideration in determining the existence of supervisory liability."  Id. (emphasis added).

D.  Application of the Supervisory Liability Qualified Immunity Standard

Penate argues that Hanchett is liable for Farak's actions because Farak's behavior, coupled with Hanchett's general lack of supervision in the Lab, must have given him constructive notice that there was a substantial risk that Farak was abusing drugs while testing the drug samples in Penate's case.  His complaint points to three discrete events which, according to

---

[6]  As we said in Maldonado, we do not need to resolve here whether the Supreme Court's decision in Iqbal, 556 U.S. at 677, has altered these or other pre-Iqbal supervisory liability standards.  Maldonado, 568 F.3d at 274 n.7.

Penate, should have put Hanchett on notice. We disagree that these events, singly or in combination, provided sufficient warning to Hanchett to constitute constructive notice that his actions or inactions amounted to a violation of Penate's rights, so as to make him deliberately indifferent to Penate's constitutional rights.

First, during a 2008 audit, Hanchett noticed that the methamphetamine oil the Lab kept as a standard was not in the condition he expected it to be. He "surmised the drug was just degrading," and did not realize that Farak had added water to the standard. Next, four years later, chemist Annie Dookhan's misconduct at a different DPH lab came to light, and Hanchett, in the late summer or early fall of 2012, while the Amherst Lab was very busy, did another audit of the Lab's standards and found that many of them were at far lower levels than he anticipated. He suspected possible wrongdoing but did not act on that suspicion. Finally, in January 2013, Hanchett found a beaker with some unknown liquid and white residue on its edge. He asked Farak about it. After Farak denied knowing anything about it, Hanchett "decided another coworker must have brought her daughter to the lab and did a science experiment."[7]

---

[7] There is no allegation in the complaint that a co-worker did not have a daughter or that the co-worker never brought her daughter to the Lab.

Hanchett's failure to investigate further in response to these three incidents, singly or collectively, did not rise to the level of "deliberate indifference." While this court has said that a "known history of widespread abuse [can be] sufficient to alert a supervisor to ongoing violations," Maldonado-Denis, 23 F.3d at 582, there are no allegations of such a "known history" here, nor do the facts alleged come close to that. Indeed, we have repeatedly cautioned that knowledge of "isolated instances" of even confirmed unconstitutional activity is ordinarily insufficient to show deliberate indifference. See Estate of Bennett v. Wainwright, 548 F.3d 155, 178 n. 7 (1st Cir. 2008) (quoting Maldonado-Denis, 23 F.3d at 582). These particular incidents, far from being instances of known unconstitutional activity, were all plausibly subject to explanations which would not reasonably trigger further investigation.

Penate counters that these incidents should not be read on their own but should be interpreted in light of the later-acquired knowledge that Farak was either actively abusing drugs or suffering from withdrawal for virtually the entire time she was employed at the Lab. Without accepting the premise, we note that Farak kept her drug abuse a secret and took steps to cover up her thefts. When directly questioned about the beaker with the residue, she lied and denied any knowledge of it. There is no allegation that anyone in the Lab, not Hanchett, not his

predecessor, and not Farak's co-workers, thought Farak was abusing drugs, much less that any such abuse led to her falsifying results. Supervisors are expected to draw reasonable inferences, but Hanchett was not in a better position to deduce what many others also did not. The allegations here do not even claim that there was a record of prior discipline of Farak based on any failures to follow lab regulations.

Penate pleads many facts about the Lab's lax security protocol and Hanchett's failure to oversee meaningfully the chemists under his supervision. But even if Hanchett were negligent in his supervisory duties, that does not suffice. These general allegations do not show Hanchett was on notice that his supervisory failings amounted to a violation of "the constitutional rights of others."[8] Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (emphasis added); accord Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006) (affirming that a complaint claiming supervisory liability against lab supervisors should be dismissed when the plaintiff

---

[8] We also reject Penate's argument that the pleading standards for qualified immunity in a supervisory liability case should be relaxed at the motion to dismiss stage. We rejected a similar argument in Saldivar v. Racine, 818 F.3d 14, 19-20 (1st Cir. 2016), a motion to dismiss case which held the plaintiff to the pleading standards set forth in Iqbal, 556 U.S. at 678, that the claim must be "plausible on its face." We note that this § 1983 complaint was brought only after Penate had the facts from extensive investigations into Farak's misconduct and the Amherst Lab and the findings by the Massachusetts courts.

only alleges that they "failed to review their subordinates' work").

In sum, Penate has not shown that, under the facts alleged, Hanchett clearly acted with deliberate indifference to Farak's alleged Brady violations or otherwise should have understood that his acts or omissions jeopardized Penate's constitutional rights. Accordingly, Hanchett is entitled to qualified immunity, and we reverse the district court's denial of Hanchett's motion to dismiss the § 1983 claim.

E. Intentional Infliction of Emotional Distress

Hanchett also argues that we should reverse the district court's denial of his motion to dismiss the state law claim for intentional infliction of emotional distress because Penate failed to state a claim. There is, though, a predicate question of whether there is exercisable federal jurisdiction, both at the appellate and district court level.

"Generally, interlocutory review of a decision denying qualified immunity under § 1983 'does not in and of itself confer [appellate] jurisdiction over other contested issues in the case.'" Hunt v. Massi, 773 F.3d 361, 371 (1st Cir. 2014) (quoting Suboh v. Dist. Att'y's Office of Suffolk Dist., 298 F.3d 81, 97 (1st Cir. 2002)). "The Supreme Court has outlined two instances in which pendent appellate jurisdiction may be appropriate: when an issue is 'inextricably intertwined' with a denial of immunity,

- 21 -

and if review of the pendent issue 'was necessary to ensure meaningful review' of immunity." Lopez v. Massachusetts, 588 F.3d 69, 81-82 (1st Cir. 2009) (quoting Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 51 (1995)). All circuits have adopted this test. See id. at 82 (collecting cases).

Hanchett argues that, as framed by the magistrate judge, the conduct that makes him potentially liable for intentional infliction of emotional distress is essentially the same as that which would make him liable under § 1983, and so the two issues are "inextricably intertwined." See id. at 83.

This argument goes to the merits of the § 1983 supervisory liability claim and not to the second prong of qualified immunity. Hanchett does not separately argue that any ruling on our part on the clearly established prong of qualified immunity is "inextricably intertwined," and so he has waived such argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Regardless of that waiver, the qualified immunity issue is not "inextricably intertwined" with the merits of the state law claim.

The claim which provides the sole basis for federal jurisdiction has now been dismissed. As we said in Suboh: "We fully expect that the district court . . . will reevaluate its earlier rulings in light of this opinion." 298 F.3d at 97. When all federal-law claims are eliminated before trial, usually "the

balance of factors [from United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966)] will point toward declining to exercise jurisdiction over the remaining state-law claims." Eves v. LePage, 842 F.3d 133, 146 (1st Cir. 2016) (quoting Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 392 (1st Cir. 2014)), vacated in part and reinstated in part by Eves, 927 F.3d at 589.

We also comment that a dismissal without prejudice may enable the state courts, which are often better suited than are federal courts to resolve questions of state law, to address these malfunctions by the state drug testing labs.[9]

### III.

We reverse and order the entry of dismissal of the § 1983 claim, and we vacate and remand the judgment on the intentional infliction of emotional distress state law claim for further consideration in light of this opinion.  No costs are awarded.

---

[9]     State law has been rapidly developing since both the Farak and Dookhan crimes came to light.  See Commonwealth v. Sutton, No. SJ-2019-0316 (Mass. Oct. 17, 2019) (single justice decision) (discussing what obligations members of the "prosecution team" have to defendants under state law); Commonwealth v. Ware, 27 N.E.3d 1204, 1212 (Mass. 2015) (same); Commonwealth v. Scott, 5 N.E.3d 530, 541-43 (Mass. 2014) (same); cf. Comm. for Pub. Counsel Servs. v. Attorney General, 108 N.E.3d 966, 986 (Mass. 2018) (distinguishing between misconduct by a lab chemist and misconduct by a prosecutor or investigator).