# United States Court of Appeals
## For the First Circuit

No. 21-2007

STEVEN PUNSKY,

Plaintiff, Appellant,

v.

CITY OF PORTLAND; PTL KIM ANN DONNEL; PTL DARREL GIBSON; SGT
JACOB TITCOMB; CHIEF VERN MALLOCH; SGT CHRIS DYER; PTL JONATHAN
JAMES LACKEE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch, Thompson, and Gelpí,
Circuit Judges.

Jeffrey Bennett, with whom Legal-Ease, LLC, P.A. was on brief,
for appellant.
John J. Wall, with whom Monaghan Leahy, LLP was on brief, for
appellees.

November 29, 2022

**GELPÍ**, **Circuit Judge**.  Steven Punsky ("Appellant" or "Punsky") brought various constitutional claims under 42 U.S.C. § 1983 in the United States District Court for the District of Maine, alleging violations of the Fourth and Fourteenth Amendments of the U.S. Constitution, as well as state law tort claims under the Maine Civil Rights Act ("MCRA"), Me. Stat. tit. 5, § 4682, against the City of Portland and six city police officers: Kimberly Donnell, Darrel Gibson, Jacob Titcomb, Vern Malloch, Chris Dyer, and Jonathan Lackee (collectively, "Appellees" or "officers"). Punsky alleged that the officers violated his constitutional rights when they left him standing in socks in freezing temperatures for approximately twenty-six minutes while they investigated a domestic violence incident in which he was involved. The district court entered summary judgment in favor of Appellees on the basis of qualified immunity, finding that their actions were "objectively, legally reasonable" in the unique circumstances present.  As to the state law tort claims, the district court held likewise that Appellees were immune.  This appeal followed.

## I. Background

### A. Domestic Violence Incident at Appellant's Residence

On December 31, 2017, the Portland Police Department ("PPD") received a call alerting of a domestic violence incident involving Appellant.  When dispatch notified Appellees of the event, it cautioned that the occupants of the house had been

drinking, they were wrestling on the floor, and the address was "flagged" for firearms.[1] Upon arrival, the PPD officers observed two males, Appellant and his son, brawling on the kitchen floor. Appellant had a scar on his face and was bleeding. Officer Lackee ordered him to get off his son immediately and to lie down. However, Appellant was noncompliant, verbally aggressive, and threatening to the officers. Specifically, he shouted at Officer Lackee, "I'm not laying on the floor in my own house." Furthermore, he warned Officer Lackee that if he dared tase him, it would be the "worst mistake of his life" as he would "com[e] after" him. After some back and forth talk with Appellant, Lieutenant Kevin Cashman (who had just arrived at the scene and is not a party to the suit) persuaded him to step outside of the house to talk.[2] It was a cold night -- around zero degrees Fahrenheit at 9:00 PM and there was snow on the ground. Appellant at the time was wearing socks, a long-sleeved shirt, and shorts. Consequently, within a minute of stepping outside, Officer Lackee and Lieutenant Cashman offered him shoes, which he refused to accept. In the meantime, inside the house, Officers Gibson and

_____

[1] A "flagged" residence indicates that on a prior occasion an officer was dispatched to the residence and learned that at least one occupant kept a firearm threat.

[2] Appellant contends that an officer pointed a taser at him outside of his home, although he was unable to identify said officer. There is no record evidence that a taser was ever used.

- 3 -

Donnell interviewed Appellant's wife and son. Appellant's wife validated that there were firearms inside the house and that she hid them from Appellant because she felt worried about him having access to them. She also told the officers that Appellant had been drinking. Their son added that he fought his dad to defend his mother after Appellant "had gotten into her face and poked her." After approximately nine minutes had elapsed since Appellant was taken outside, a Portland Fire Department paramedic arrived at the scene and evaluated him for any possible injuries. Appellant stated that he was fine and felt no pain "whatsoever." Moreover, the paramedic also offered Appellant shoes, which he said he did not want and that he did not care about the cold. The paramedic additionally offered to take him to the ambulance, but he declined, stating again that he was fine. The paramedic asked Punsky questions to elicit whether he was oriented in space and time. He determined that Punsky was competent, aware of his surroundings, and had decision-making capability.

Following his medical assessment, Appellant started walking towards his house when Appellees told him to back up since by then they had determined that he was the primary aggressor in the fight with his son. The officers, proceeded to arrest him, and once again he began to threaten the officers, telling them that tasing him would "be the worst fucking mistake of [their] li[ves]" and that they would lose their jobs. Thereafter, the

- 4 -

officers decided that they needed to place Appellant in an arrest wagon rather than a cruiser for he was being too aggressive, and the officers feared a physical altercation would occur.[3]  As the officers awaited the arrival of the arrest wagon, Appellant remained confrontational and verbally combative, swearing at the officers.  In the interim, he briefly mentioned an alleged mental health disorder to the officers.[4]  Concerned about Appellant's incessant refusal to put on shoes, Appellees placed a pair of sneakers next to him, but he declined to put them on.  At no point did he complain about the shoes being too small.  He later protested about "hav[ing] stocking feet," to which the officers responded, "You don't have to have stocking feet.  We've asked you if you wanted sneakers five times now."

Appellees' version of what transpired is supported by body camera audio and video, in which they (we infer from the recordings that it was either Officer Gibson and/or Officer Donnell) offered Appellant footwear at least eight times throughout the interaction.  Each time, Appellant dismissed the offer or ignored it.  Appellant told them that he "d[id not] need

---

[3] According to the record, Punsky stands at 6'3" and weighed approximately 360 pounds at the time of the incident.

[4] Punsky mentioned to an officer (likely Officer Gibson as the audio recording came from his body camera) his alleged mental health condition, to which the officer responded, "I'm not medically trained so I can't really help you . . . ."

[their] goddamn shoes," "d[id] not need any help," and "d[id] not want [the] shoes."

The officers did not consider bringing Appellant back into the house because his aggressive behavior posed a safety concern not only for the officers but for Appellant's wife and son who were fearful of his violent behavior. Moreover, the arrest wagon arrived at the scene quickly, rendering unnecessary any attempt to bring Appellant into the house and conduct a house sweep. Appellant was then taken to Maine Medical Center for further evaluation. Upon discharge, Appellees took him to the Cumberland County Jail and he was charged with domestic assault. Despite making no complaints about the cold or pain in either foot, Appellant sustained frostbite and injuries to both feet.[5]

## B. Procedural History

Punsky initially filed the instant action against Appellees in Maine state court. Appellees timely removed the same to the United States District Court for the District of Maine. Shortly after, Appellant filed his second amended complaint, in which he pled seven counts which included § 1983 claims of excessive force and supervisory liability in violation of the Fourth and Fourteenth Amendments, as well as a violation of the

---

[5] There is no evidence on the record that describes the extent of said injuries.

MCRA (Me. Stat. tit. 5, § 4682).[6]  Subsequently, Appellees moved for summary judgment, which the district court granted as to all claims.  In its ratio decidendi, the district court explained that Appellees were entitled to qualified immunity because the "actions taken by the police in the unique circumstances of this case were objectively, legally reasonable" and "a reasonable officer would not have understood that his or her conduct violated [Appellant's] constitutional rights[.]"  Punsky timely appealed, solely

[6] Punsky brought the following claims before the district court: 1) Excessive Force; 2) Assault; 3) Battery; 4) Intentional Infliction of Emotional Distress; 5) Negligent Infliction of Emotional Distress; 6) MCRA (Me. Stat. tit. 5, § 4682); and 7) 42 U.S.C. § 1983 violations.  As to the excessive force in violation of the Fourth and Fourteenth Amendments claim, Punsky argued that Appellees "unreasonably" and "improperly" restrained him and caused "serious bodily injury" after leaving him standing barefoot in "below freezing temperatures."  Similarly, in the state civil rights count, Punsky contended that the City of Portland adopted a custom of mistreating individuals under custody, leading to an unconstitutional custom or policy.  Regarding the assault count, Punsky alleged that Officers Donnell, Dyer, Gibson, Titcomb, and Lackee "recklessly and intentionally placed [him] in reasonable apprehension of injury by surrounding his person, insulting him, threatening him with a taser[,] and forcing him to stand barefoot." Additionally, Punsky pled a battery claim for "offensive" and "harmful" contact when he got handcuffed.  The complaint also included claims for "severe emotional distress" due to Appellees' conduct.  Lastly, the complaint brought a § 1983 supervisory violation count against Chief Vern Malloch for his failure to act and promulgate appropriate policies within the police department.

The district court twice denied Punsky leave to further amend his second amended complaint specifically to add a claim under the "special relationship doctrine."

challenging the grant of summary judgment as to the officers' actions under § 1983 and the state law.[7]

## II. Standard of Review

We review a district court's entry of summary judgment on qualified immunity grounds de novo.  Est. of Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022).  We will affirm "only when the record, read in the light most favorable to the nonmovant, presents no genuine issues as to any material fact" and the moving party is entitled "to judgment as a matter of law."  Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017); see also Fed. R. Civ. P. 56(a).

## III. Discussion

### A. Qualified Immunity

Public officials are immune under the doctrine of qualified immunity if sued in their individual capacities unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)).  When considering the first prong, we must decide whether the facts alleged by Appellant "make out a violation of a

---

[7] Punsky brought excessive force and unreasonable seizure claims but has not appealed the district court's grant of summary judgment to Appellees on those claims.  The same are thus, not properly before us.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

constitutional right." Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). Under the second prong, we consider "two related aspects." Id. at 9. The first relates to the "clarity of the law at the time of the alleged violation" while the second "considers the specific facts of the case at bar." Id. In regards to the first aspect of the second prong, a "clearly established" right is one that is "sufficiently clear" such that "every reasonable official would have understood that what he is doing violates that right." Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). Under the second aspect of the second prong, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Rocket Learning, 715 F.3d at 9 (quoting Maldonado, 568 F.3d at 269) (alterations in original). The plaintiff must satisfy both aspects of the second prong to demonstrate that the law was clearly established. Id. at 8-9.

Because we can resolve the qualified immunity challenge considering the prongs in any order, Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011), we start (and finish) by analyzing the second aspect of the second prong: whether it would be clear to a reasonable officer that his or her conduct violated Appellant's

constitutional rights.  Penate v. Hanchett, 944 F.3d 358, 366 (1st Cir. 2019).

We find that under the particular circumstances that Appellees found themselves in, a reasonable officer in their positions could have not concluded that keeping Appellant standing with socks in cold temperatures was unlawful, especially after offering him footwear multiple times since the outset.  Let's recall what transpired that turbulent night.  PPD officers responded to a call that alerted of a domestic violence incident at Punsky's residence.  The officers were informed beforehand that someone in the house possessed firearms.  Upon arriving to the scene, Punsky and his son were fighting on the floor.  After a standoff in the house in which Punsky threatened and disobeyed the officers' commands, Appellees were able to remove him from the house.  His wife and son felt threatened by him and feared for their well-being.  Appellant's wife further confirmed to Officers Donell and Gibson that there were firearms inside the home.

Appellant argues that the district court erred in granting summary judgment because doing so required the court to resolve several factual disputes in the officers' favor.  We disagree.  Nearly immediately after stepping outside, Appellees offered Punsky shoes, which he declined repeatedly.  Instead, he kept acting in a violent manner, often threating the officers by stating, for example, "It's war and that's all I'm going to say."

Appellees took steps to ensure that Punsky was protected from the elements -- on at least eight occasions they offered shoes, which Appellant declined, and even brought a pair of sneakers to Punsky, which he rejected. When the paramedic arrived, Appellant was evaluated and asked if he was in pain, to which he indicated otherwise.[8] Furthermore, Punsky did not show any signs of emotional distress or disorientation. He was later taken to Maine Medical Center for further assessment.

Qualified immunity exists to shield all defendants except those who are "plainly incompetent" or "who knowingly violate the law." Eves v. LePage, 927 F.3d 575, 583 (1st Cir. 2019) (quoting White v. Pauly, 580 U.S. 73, 79 (2017)). Here, the officers acted in an objectively reasonable manner responding to a "dangerous, rapidly evolving situation[]" in which Appellant engaged in loathsome behavior against his wife and son. Est. of Rahim, 51 F.4th at 410 ("[The reasonableness] requirement provides 'breathing room' to officers -- who are often called on to respond to dangerous, rapidly evolving situations[.]") We thus conclude that any reasonable officer would have objectively believed that his or her actions did not violate Appellant's constitutional rights. Appellees are thus entitled to qualified immunity.

---

[8] Appellant complained about some neck and back pain while the arrest was unfolding, but, as he stated, it was unrelated to the events that unfolded that night.

### B. Maine Tort Claims

Additionally, Appellant brought tort claims against Appellees. Appellees argued in their motion for summary judgment that they were "absolutely immune" because they had engaged in discretionary acts protected by state law. Appellant failed to contest said assertion and thus the district court concluded that the claim has been waived and entered summary judgment in Appellees' favor. We agree. On appeal, Appellant posits that the district court erred in granting tort immunity to Appellees because holding him outside for twenty-six minutes in freezing temperatures exceeded the officers' discretionary functions. However, he did not address the waiver issue before us and, although he attempts for the first time to respond to Appellees' argument on the merits, "[a]ppellants cannot raise an argument on appeal that was not 'squarely and timely raised in the trial court.'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 59 (1st Cir. 2021) (alteration in original) (quoting Thomas v. Rhode Island, 542 F.3d 944, 949 (1st Cir. 2008)). That ends the matter.

## IV. Conclusion

For all the above, we **affirm** the district court's grant of summary judgment.