# United States Court of Appeals
## For the First Circuit

No. 22-1427

ISAURA PENATE,

Plaintiff, Appellant,

v.

DANIEL F. SULLIVAN; GARY J. GEMME, Chief of Police;
GEORGE ADAMS; DONNA BRISSETTE; CITY OF WORCESTER,

Defendants, Appellees,

JOSEPH SCAMPINI, JOHN DOES 1 THROUGH 8,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Kayatta, Howard, and Montecalvo,
Circuit Judges.

Robert A. Scott, with whom Héctor E. Piñeiro and Lizabel M.
Negrón-Vargas were on brief, for appellant.
Wendy L. Quinn, with whom Michael E. Traynor, City Solicitor,
and Hassett & Donnelly, P.C., were on brief, for appellees.

July 11, 2023

**KAYATTA**, **Circuit Judge**.    On April 12, 2016, the Worcester police used a SWAT team to execute a warrant at a residential apartment.  They were looking for evidence of a violent crime but instead found Isaura Penate, a pregnant nineteen-year-old who spoke no English.  Shortly after the SWAT team entry, Penate started experiencing contractions, and she gave birth the next day although her due date was not for another two weeks.  She was later diagnosed with post-traumatic stress disorder.

Penate sued the City of Worcester and several officers involved in the entry, claiming that the officers violated her constitutional rights and committed several torts, for which the City was also liable.  The district court granted summary judgment for the City and the individual defendants, reasoning that none of the officers violated Penate's constitutional rights and that even if they did, they are entitled to qualified immunity.  As we will explain, we agree that the individual defendants are entitled to qualified immunity and that neither they nor the City are liable for the other torts alleged.  Our reasoning follows.

**I.**

**A.**

A woman appeared at a rooming house on Main Street in Worcester around 2:30 a.m. on April 12, 2016, wearing only a t-shirt and asking for help because she had been raped.  Police were called, and the woman was taken to the hospital.  Detective Donna

Brissette spoke with the victim around 4:00 a.m. The victim recounted that she had left a club with two men who told her they knew her brother. The men initially took her to her brother's apartment. Then one of the men, who went by the name "Chino," said he was having a party at his place, and the woman agreed to accompany him there. The two men and the woman drove there in a silver SUV. Once they arrived at the third-floor apartment, the men sexually assaulted the woman. One man showed the woman a handgun in the waistband of his jeans during the assault. When the men left to get their friends, the victim fled, leaving behind her clothes, a wallet, and her phone.

Around 10:30 a.m. later that day, Detective Brissette drove the woman to the approximate area she had described as the location of the assault. The woman directed the officer to turn onto Preston Street and then identified a building, 22 Preston Street, as the location at which she had been assaulted. The woman also said that the gray SUV parked in an adjacent lot looked familiar and could have been the car in which she rode with the assailants. Shortly thereafter, by using Facebook, the victim's sister located a picture of Chino, and the victim identified him as one of her assailants. The officers at that point did not attempt to determine whether Chino or the other assailant resided at 22 Preston Street. In Detective Brissette's view, because the

- 3 -

police had reason to believe that the crime had occurred at that address, it did not matter who lived there.

Detective George Adams applied that afternoon for a warrant to search 22 Preston Street, Apartment 3. The warrant application was granted at 1:55 p.m. and permitted officers to enter during the day and with announcement. Police officers requested SWAT team assistance because the victim had seen a gun during the assault. Detective Daniel Sullivan led the team executing the warrant.

The officers' story about what happened when they arrived at the apartment differs from Penate's. Defendants assert that officers knocked and announced their presence multiple times, in English and Spanish, while they waited to retrieve the proper tool to enter the apartment. Penate says that the officers did not knock or announce their presence. Because this appeal arises from a grant of summary judgment, and because Penate's version is supported by evidence in the record (namely, her testimony), we assume that the entry occurred without any announcement sufficient to alert Penate. See Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (noting that when deciding a question of qualified immunity at summary judgment stage, the court "fram[es] the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events"); Moses v. Mele, 711 F.3d 213, 216–17 (1st Cir. 2013) (finding that where the "court assumed

- 4 -

for argument's sake that all disputes about material facts should be resolved in the plaintiff's favor," and "the record, so viewed, nevertheless supports a grant of qualified immunity, summary judgment is appropriate").

Upon breaching the door of the apartment with firearms drawn, the officers encountered a hanging sheet behind which Penate -- nineteen years old, not conversant in English, and thirty-eight weeks pregnant -- was napping. Penate testified at her deposition that the men were "dressed as soldiers" in combat gear ("with helmets, glasses and everything"), and that they did not identify themselves as police.

The officer in front, pointing a gun at Penate, asked her to come out from behind the sheet and raise her hands.[1] Once she did so, the officer, within "several seconds," lowered his weapon. Penate was then passed off to other officers and taken outside the apartment.

Officers asked Penate questions about Chino, the name by which the victim knew the assailant. Penate did not know anyone who went by that name. The officers eventually showed Penate the picture they had received from the victim's sister that identified Chino; Penate said she did not know and had never seen that person.

---

[1] Although Detective Sullivan was in charge of the entry team, a different officer (who is not a defendant in this case) made the initial contact with Penate and pointed his weapon at her.

The police eventually left Penate's apartment after finding no evidence of the sexual assault and noting that the premises did not match the description given by the victim.

As the officers were searching, Penate said that she was not feeling well, and an officer took her into the apartment to sit down. Penate then started experiencing contractions, and her water broke. She went to the hospital after the police left and gave birth the following morning, two weeks before her due date. Penate testified that after this experience she had anxiety, depression, nightmares, and insomnia. She was also diagnosed with post-traumatic stress disorder.

**B.**

Penate filed this lawsuit in federal district court in the district of Massachusetts, alleging claims for damages for violation of her constitutional rights pursuant to 42 U.S.C. § 1983 for unreasonable search and seizure, as well as unlawful entry, against several of the officers involved in the investigation and execution of the warrant at 22 Preston Street. She also brought state law tort claims for assault and battery and intentional infliction of emotional distress against several officers, and

negligence claims against the City of Worcester.[2]  Defendants moved for summary judgment after discovery.

The district court granted summary judgment for all defendants.  It began by accepting Penate's version of events for summary judgment purposes -- i.e., assuming that officers did not knock and announce and that they kept a weapon pointed at Penate for some time[3] after she came out from behind the sheet.  But even so, the district court determined that the officers did not violate Penate's right to be free from unreasonable searches and seizures.  The district court found that the officers' no-knock entry and their brief pointing of weapons at Penate was reasonable because they were investigating a violent crime involving the presence of a gun.  In the alternative, the district court found that Detective Sullivan was entitled to qualified immunity, because it was not clearly established that officers were required to either knock and announce in this situation or drop their weapons in fewer than several seconds.  Detectives Adams and Brissette were not involved in the initial entry, so the district court granted summary judgment to them on that basis.  The district court further found that the individual defendants were entitled to summary judgment

---

[2]  Additionally, Penate brought claims for supervisory liability and violation of public records laws against the City of Worcester.  Those claims were dismissed, and their dismissal is not at issue on appeal.

[3]  Penate's counsel clarified at oral argument that she was covered at gunpoint for "several seconds."

on the tort claims.  Finally, the court found that the City was not liable to Penate under the Massachusetts Tort Claims Act (MTCA), because the officers had probable cause to search Penate's apartment and were therefore not negligent.[4]  This timely appeal followed.

## II.

## A.

We review a grant of summary judgment de novo.  Alston v. Town of Brookline, 997 F.3d 23, 35 (1st Cir. 2021).  Summary judgment is warranted "when the record reflects no genuine issue as to any material fact and indicates that the moving party is entitled to judgment as a matter of law."  Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009).  In determining whether this is the case, a court is required to view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Alston, 997 F.3d at 35.  Where there is a question as to qualified immunity, the court must "identify[] the version of events that best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful."  Morelli, 552 F.3d at 19.  Here, we will follow the

_____

[4]  The district court also found in the alternative that the negligence claim was barred by the exemption from liability under the MTCA for discretionary actions.

district court and assume that all facts are as Penate testified to -- namely, that officers did not knock or announce their presence and that one of them briefly continued to point a weapon at her even after they could see her. See Moses, 711 F.3d at 216-17 (noting that the court could "assume[] for argument's sake that all disputes about material facts should be resolved in the plaintiff's favor"); Morelli, 552 F.3d at 18-19 (noting that summary judgment requires "deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality)").

Qualified immunity shields government officials from civil damages "unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lawless v. Town of Freetown, 63 F.4th 61, 67 (1st Cir. 2023) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Whether an official is entitled to qualified immunity is governed by a two-prong analysis, which a court may resolve on either prong. The first prong asks "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right"; the second prong asks whether that right "was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Pearson, 555 U.S. at 232). "[T]he second step, in turn, has two

aspects.  One aspect of the analysis focuses on the clarity of the law . . . .  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."  Id.

A plaintiff need not find an identical case concluding that a constitutional violation occurred.  Begin v. Drouin, 908 F.3d 829, 836 (1st Cir. 2018).  But in order to show that the law was clearly established, a plaintiff has the burden to identify "controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal in the particular circumstances that he or she faced."  Escalera-Salgado v. United States, 911 F.3d 38, 41 (1st Cir. 2018) (quoting Rivera-Corraliza v. Morales, 794 F.3d 208, 214–15 (1st Cir. 2015)).

**B.**

We begin with Penate's claim under section 1983 that several of the officers violated her constitutional rights to be free from excessive force, unreasonable searches and seizures, and unlawful entry into her home.  Penate makes three arguments in this regard.  First, she argues that officers violated her right to be free from unreasonable searches by failing to knock and announce their presence before entering her apartment, and by failing to investigate sufficiently before conducting a no-knock

entry. Second, she asserts that officers violated her right to be free from excessive force by continuing to point a weapon at her for several seconds after realizing she was not a threat. Third, she argues that the officers' conduct as a whole, including their failure to further investigate before choosing to conduct a SWAT team entry, rendered the entry and seizure unreasonable. As we will explain, as to all of these theories, the law did not clearly establish that any of the officers' actions would have constituted a violation of Penate's Fourth Amendment rights. The officers are therefore entitled to qualified immunity.[5]

**1.**

We consider first Penate's challenge to the manner in which the officers entered her home.[6] Generally, the Fourth Amendment requires that police officers seeking to enter a dwelling must announce their identity and purpose before entry. Wilson v. Arkansas, 514 U.S. 927, 934 (1995). Nevertheless, there are exceptions to this general rule, and some "circumstances under

---

[5] The district court considered only Detective Sullivan's liability, because he was the only defendant who participated in the initial entry. Because Penate's Fourth Amendment claims appear to be aimed at the investigation as well, we consider the actions of all officers.

[6] The district court construed Penate's claim as alleging excessive force only. Based on Penate's complaint and briefing, we assume favorably to her that she has alleged a separate Fourth Amendment violation for the entry and search. The district court, in any event, ruled that the officers did not violate the law in entering Penate's home.

- 11 -

which an unannounced entry is reasonable under the Fourth Amendment." Id. at 936. One such circumstance is that presenting a threat of violence. Id.

In Richards v. Wisconsin, 520 U.S. 385 (1997), the Supreme Court restated the standard for determining when the circumstances justify a no-knock entry: "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence . . . would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Id. at 394. This reasonable suspicion showing "is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." Id. at 394-95. Police need not, however, obtain advance permission from a judicial officer to conduct a no-knock entry. United States v. Boulanger, 444 F.3d 76, 83-84 (1st Cir. 2006) ("We see no reason why a no-knock entry that is reasonable at the time it is conducted would suddenly become unreasonable because the officers . . . did not inform the issuing judge of their intention.").

Our court has subsequently fleshed out the reasonable-suspicion standard where police suspect that an announced entry would be dangerous. Sitting en banc in 2002, we considered a district court ruling that the reasonably suspected presence of drugs and a weapon supported a no-knock entry even without any

- 12 -

evidence shedding more light on the likelihood that the weapon would be used. United States v. Brown, 276 F.3d 14 (1st Cir. 2002) (Mem.). In splitting 3-3, the en banc court affirmed the district court ruling. Notably, one of the three judges who would have reversed or vacated the district court ruling found the court's reasonable suspicion analysis insufficient only because the evidence that a gun might be present was too stale. Id. at 17 (Lipez, J.). One year later, our court held that evidence of drug sales, the presence of "bizarre[ly]" dispersed knives throughout a small apartment, and the possible presence of a firearm provided sufficient justification for what was essentially a no-knock entry (officers waited only five seconds before breaking down the door). United States v. Sargent, 319 F.3d 4, 11-12 (1st Cir. 2003). We also held a few years later that a no-knock entry was justified where the target was a suspect in an armed robbery and had prior firearms convictions, and where an informant reported seeing a fake gun at the target's residence. Boulanger, 444 F.3d at 82-83.

All that being said, we have never suggested that no-knock entries are to be undertaken in the ordinary course. The knock-and-announce requirement protects "human life and limb, because an unannounced entry may provoke violence in supposed self-defense." Hudson v. Michigan, 547 U.S. 586, 594 (2006); see also Miller v. United States, 357 U.S. 301, 313 n.12 (1958) ("Compliance

- 13 -

[with a statutory knock-and-announce requirement] is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder."). Experience over the past two decades makes clear that no-knock entries pose serious risks both to occupants and to the entering police. See, e.g., Kevin Sack, Door-Busting Drug Raids Leave a Trail of Blood, N.Y. Times, https://www.nytimes.com/interactive/2017/03/18/us/forced-entry-warrant-drug-raid.html (Mar. 18, 2017) (reporting that based on a Times investigation, at least 81 civilians and 13 law enforcement officers died from 2010 to 2016 in "dynamic entry" raids executed by SWAT teams, and "[s]cores of others were maimed or wounded"); see also Solis v. City of Columbus, 319 F. Supp. 2d 797, 807-08 (S.D. Ohio 2004) (collecting examples of "no-knock horror stories" and police errors in executing no-knock warrants). So perhaps the assessment of whether such an entry is reasonable should more strongly weigh the potential downsides and the need to consider alternatives and a more thorough investigation. See Milan v. Bolin, 795 F.3d 726, 730 (7th Cir. 2015) (finding that a violent unannounced entry was unreasonable due in part to its "prematurity" and the "failure to conduct a more extensive investigation"); Lucas v. City of Boston, No. 07-cv-10979-DPW, 2009 WL 1844288, at *18 (D. Mass. June 19, 2009) (finding "the officers' apparent lack of full preparation to be relevant in evaluating the reasonableness of the force they used inside the apartment"); cf. Ferreira v.

- 14 -

City of Binghamton, 975 F.3d 255, 274 (2d Cir. 2020) (finding that evidence supported plaintiff's negligence claim against the city based on insufficient planning of a dynamic entry where police had "no idea" how many people were inside the residence).

But here, the officers had a firsthand credible report that one of the suspects had on his person a gun. Nor is this a scenario where the police relied on the presence of a gun alone; they also had a credible report that the suspect had committed a violent crime -- just over twelve hours earlier -- serious enough to incentivize resistance to being captured, and that the suspect had carried the gun on him.[7] While Penate argues that any threat of danger was insufficient to justify the officers' actions, she points us to no First Circuit case or consensus of authority "materially similar enough to have provided reasonable officers under the circumstances with fair warning that they would violate [Penate's] rights" by entering in the manner that they did, given

---

[7] Penate argues that the police had no reason to believe the suspects lived in the unit or would still be there, and thus that any belief of danger was unjustified. But the police had a warrant that listed a handgun as an item to be seized. That, coupled with the report of a violent crime the night before and the presence of a car like that driven by the suspect, likely provided enough of a basis to at least create a reasonable suspicion that the suspect would be found in the unit. Cf. Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (noting that where officers execute a search pursuant to a warrant, unless the warrant is defective on its face, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner").

the information they had at the time.  Lachance v. Town of Charlton, 990 F.3d 14, 27 (1st Cir. 2021).  So even if the decision to execute a no-knock entry violated the Fourth Amendment (an issue we do not decide), Penate's attempt to hold the officers personally liable for damages caused by an unlawful no-knock execution of the warrant must fail.  See Punsky v. City of Portland, 54 F.4th 62, 66-67 (1st Cir. 2022) (concluding that "under the particular circumstances that [the officers] found themselves in," it would not have been clear that their conduct was unlawful; thus, the officers were entitled to qualified immunity).

**2.**

We consider next Penate's claim that the officers used excessive force by pointing a firearm at her.  Excessive force claims are premised on the Fourth Amendment right to be free from unreasonable seizures.[8]  Graham v. Connor, 490 U.S. 386, 395-96 (1989).  When officers execute a search warrant, they may seize people they find on the premises, but must "use reasonable force to effectuate the detention."  Muehler v. Mena, 544 U.S. 93, 98-99 (2005).  The reasonableness of force used in a given situation depends on "the severity of the crime at issue, whether the suspect

___

[8] "To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment . . . ."  Stamps v. Town of Framingham, 813 F.3d 27, 35 (1st Cir. 2016).  Both parties agree that Penate was seized.

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.

Pointing a weapon at a nonthreatening, compliant individual, even while executing a warrant, can constitute excessive force.  In Stamps v. Town of Framingham, 813 F.3d 27, 35 (1st Cir. 2016), we held that pointing a loaded gun, with the safety off, at a compliant bystander who was lying on the floor constituted excessive force.  Even earlier, in Mlodzinski v. Lewis, 648 F.3d 24, 38-39 (1st Cir. 2011), we concluded that holding a nonresistant, handcuffed fifteen-year-old at gunpoint for seven to ten minutes constituted excessive force, as did holding a "nearly naked" nonresistant woman at gunpoint for half an hour, including after the suspect had already been removed from the scene.

However, holding bystanders at gunpoint does not always constitute an excessive use of force.  In Los Angeles County v. Rettele, 550 U.S. 609 (2007) (per curiam), the Supreme Court found no constitutional violation where officers executing a search warrant entered a bedroom with guns drawn, ordered the residents out of bed, and then held them naked at gunpoint for one to two minutes before realizing they had the wrong house.  Id. at 614. The Court concluded that the officers' actions were "permissible, and perhaps necessary, to protect the safety of the deputies," and because there was no allegation that the detention was "prolonged"

or "longer than necessary to protect [the officers'] safety," the plaintiffs' Fourth Amendment rights were not violated. Id. at 614-16. It follows that if the pointing of weapons is both reasonably necessary to secure the officers' safety and sufficiently short in duration, there will likely be no Fourth Amendment problem. Id. Mlodzinski also focused on the length of the detention, cautioning that although the facts of that case gave rise to a constitutional violation, "the situation would be very different if, given the execution of these warrants, [the bystander] had been detained with a weapon pointed at her for only a very short period needed while she was being cuffed . . . and [the suspect] was being apprehended." 648 F.3d at 40.

Penate's counsel confirmed at oral argument that under Penate's version of facts, she was held at gunpoint for only "several seconds." She asserts that the absolute length of the detention does not control the Fourth Amendment analysis; what matters is that she was held at gunpoint longer than necessary, because it was immediately apparent that she was not a threat to officers. We need not decide whether she is correct because we conclude that the officers are entitled to qualified immunity. In 2016, "in the particular factual context of [this] case," it would not have been clear to a reasonable officer that a several second delay in lowering his gun upon seeing Penate violated Penate's right to be free from excessive force. See Mlodzinski, 648 F.3d

- 18 -

at 32-33.  "In assessing whether an official's conduct violated clearly established law, we typically reason by analogy, asking whether there is any prior case in which the use of force was deemed unlawful under circumstances reasonably similar to those present in the case at hand."  Escalera-Salgado 911 F.3d at 41. To be sure, Penate's situation does have some similarities to Mlodzinski and Stamps.  Like the bystanders in those cases, Penate was not thought to be dangerous, she submitted to the officers' authority immediately, and according to her testimony officers pointed guns at her even after they determined she was not a threat.  But those cases differ from Penate's case in an important respect: they involved periods of time longer than the "several seconds" of gunpoint coverage that Penate experienced.  Indeed, Mlodzinski contains language indicating that it might have come out differently had the detention been shorter.  648 F.3d at 40. And Rettele, another factually similar precedent, found no violation where plaintiffs were held at gunpoint for a few minutes. 550 U.S. at 616.  Given this precedent, it would not have been clear to a reasonable officer in 2016 that pointing a gun for "several seconds" upon warranted entry to an apartment suspected of containing a firearm (and possibly an armed suspect) constituted excessive force, or at least not so clear that "no competent officer could have thought that [it] was permissible."  Mlodzinski, 648 F.3d at 36-37 (concluding that officers were entitled to

qualified immunity for placing occupants of premises to be searched in handcuffs because, in light of a recent Supreme Court case presenting a somewhat analogous situation, appropriateness of detention would have been "fairly debatable among reasonable officers").

### 3.

Finally, Penate argues that the officers' actions as a whole were unreasonable considering what they knew (and, more importantly, didn't know) about who they would encounter at 22 Preston Street. She points out that the police did not investigate who lived at the apartment, and that, having failed to do so, they used a SWAT team to force the door and enter without knocking and with guns drawn. This entire course of conduct, she claims, means that she was seized with force that was unreasonable under the circumstances.

Even considering the entire course of conduct together,[9] the officers are entitled to qualified immunity because it would

_____

[9] We recently held that a "segmented approach" to excessive force claims -- analyzing each use of force separately -- is consistent with other circuits and with Supreme Court precedent, "at least when circumstances relevant to the reasonableness inquiry changed between one use of force and another." Lachance, 990 F.3d at 25. But we noted that this ruling did not mean that "after segmenting the uses of force and assessing each as reasonable, a court could not thereafter look at the totality of the uses of force and determine that there was a constitutional violation." Id. at 25 n.10 (citations omitted). It is not immediately obvious how this standard applies to Penate's claims, because she alleges multiple types of Fourth Amendment violations.

not have been clear to a reasonable officer that the combination of those actions violated established law. Simply put, for the same reasons that rendered the no-knock entry not clearly unreasonable, so too no sufficiently established case law made it reasonably clear that the no-knock entry could not be effected with raised guns that were lowered within a few seconds of realizing that a person was not a danger. And Penate points us to no case clearly establishing that it was clearly unreasonable to use a SWAT team under the circumstances.

We do not minimize Penate's experience, and we acknowledge her pain and fear. But we nonetheless conclude that it would not have been clear to a reasonable officer that the officers' conduct violated established law, and the officers are thus entitled to qualified immunity on Penate's section 1983 claims.

**C.**

We turn now to Penate's tort claims against the individual defendants. One of these claims is dispatched easily: Penate makes no mention of her assault and battery claim in her appellate briefing. This claim is therefore waived. See, e.g., Landrau-Romero v. Banco Popular De P.R., 212 F.3d 607, 616 (1st Cir. 2000).

Penate's claim for intentional infliction of emotional distress ("IIED") need not detain us long either. To make out a

claim for IIED under Massachusetts law, a plaintiff must show "(1) that [defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014). The standard for IIED claims "is very high." Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" Polay, 10 N.E.3d at 1128 (alterations in original) (quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)).

The officers' actions here cannot be classified as extreme and outrageous. The SJC has found that "[n]either applying for an arrest warrant, nor making an arrest pursuant to an issued warrant can be considered 'utterly intolerable in a civilized community.'" Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994) (quoting Agis v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976)). Accordingly, we believe that entering a home thought to contain an armed and violent suspect to execute a search warrant issued by a neutral magistrate -- even if the entry was conducted without knocking and with weapons raised -- cannot be classified as "beyond all possible bounds of decency." Agis, 355

N.E.2d at 319 (quoting Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)).  Even without affirmatively concluding that the officers' actions were reasonable (which we do not decide), we conclude that their conduct did not reach the requisite level needed for IIED liability.  Cf. Dean v. City of Worcester, 924 F.2d 364, 368–69 (1st Cir. 1991) (concluding that officers were not liable for IIED where they used force that would have been lawful to arrest suspect based on reasonable mistake of identity); McDonald v. City of Boston, 334 F. Supp. 3d 429, 441–42 (D. Mass. 2018) (finding that defendant who had applied for an arrest warrant without probable cause was not liable for IIED because officer had not engaged in "extreme and outrageous conduct" toward the plaintiff).  Because this conduct cannot be classified as extreme and outrageous, Penate cannot succeed on her IIED claim, and summary judgment is warranted for defendants.

**D.**

That leaves only Penate's negligence claim against the City of Worcester.  Penate argues that under the MTCA, the City is liable "for her injuries, which were proximately caused by the raid into her home without probable cause," because "the Appellees were grossly negligent in how they conducted their investigation." The district court concluded that "a jury would be hard pressed to

- 23 -

find that the City was negligent," finding that probable cause had "plainly" been established. We agree.

To establish probable cause for a search warrant, "[a]n affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." Commonwealth v. Donahue, 723 N.E.2d 25, 28 (Mass. 2000) (alteration in original) (quoting Commonwealth v. Cinelli, 449 N.E.2d 1207, 1216 (Mass. 1983)); see United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016) ("[A] search-warrant application must reveal probable cause to believe two things: one, that a crime has occurred . . . and two, that specified evidence of the crime will be at the search location . . . ."). "The affidavit need not convince the magistrate beyond a reasonable doubt, but must provide a substantial basis for concluding that evidence connected to the crime will be found on the specified premises." Donahue, 723 N.E.2d at 28; see Rivera, 825 F.3d at 63 (explaining that probable cause "demands only 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Here, the affidavit supporting the search warrant recounted that a woman said she had been raped just hours before,

- 24 -

and had identified 22 Preston Street, Apartment 3, as the location of her assault.  The affidavit also stated that the victim said she had left her clothes, wallet, and phone behind, all of which were listed in the warrant as items to be seized.  Under these circumstances, the victim's affirmative identification of the building provided a "substantial basis for concluding" that the assault took place there and that evidence of the crime would be found there.  See Donahue, 723 N.E.2d at 28.  Thus, we agree with the district court that the warrant was plainly supported by probable cause.  Accordingly, Penate's negligence claim -- that the police raided her home without probable cause as a result of a negligent investigation -- must fail.[10]  We therefore affirm the district court's dismissal of the MTCA claim.

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

---

[10]  The district court also concluded that Penate did not assert a negligence claim with respect to the manner in which the officers executed the warrant.  Penate does not challenge that conclusion on appeal.