# United States Court of Appeals
## For the First Circuit

No. 22-1833

KWESI ABLORDEPPEY,

Plaintiff, Appellant,

v.

BENNETT WALSH; DAVID CLINTON; VANESSA LAUZIERE; VANESSA
GOSSELIN; CELESTE SURREIRA,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Leonard H. Kesten, with whom Erica L. Brody, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellant.
Diana Day Foskett, with whom Barry M. Ryan, Erin J. Meehan, and Doherty, Wallace, Pillsbury and Murphy, P.C. were on brief, for appellee Bennett Walsh.
Jeffrey J. Pyle, with whom John F.X. Lawler and Prince Lobel Tye LLP were on brief, for appellee David Clinton.
Jared L. Olanoff was on brief for appellee Vanessa Lauziere.
Joseph B. Hernandez, with whom Douglas S. Brooks and Libby Hoopes Brooks & Mulvey, P.C. were on brief, for appellee Vanessa Gosselin.
Kevin C. Giordano, with whom Keyes and Donnellan, P.C. was on brief, for appellee Celeste Surreira.

October 25, 2023

**GELPÍ**, **Circuit Judge**.  In early 2020, the unprecedented SARS-CoV-2 virus ("COVID-19" or "virus") caused global disruption. Soldiers' Home,[1] a state-funded healthcare facility that houses our nation's veterans in Holyoke, Massachusetts, faced the rapidly evolving nature of the widespread outbreak.  Kwesi Ablordeppey ("Appellant") was a certified nursing assistant at Soldiers' Home at the time.  Despite not contracting the virus, Appellant sued Soldiers' Home's supervisors -- Bennett Walsh, the Superintendent; David Clinton, the Medical Director; Vanessa Lauziere, the Chief Nursing Officer; Vanessa Gosselin, the Infectious Disease Nurse; and Celeste Surreira, the Assistant Director of Nursing (collectively, "Appellees") -- alleging violations of his constitutional substantive due process rights to a safe work environment, to be free from a state-created danger, and to bodily integrity.[2]  The district court dismissed the case.  We affirm.

---

[1] Soldiers' Home is a state-funded health care facility that offers residential accommodations, hospice care, and outpatient services to our nation's veterans.  It is managed by a Board of Trustees appointed by the Massachusetts Governor.  The Board of Trustees assigns a Superintendent who then appoints a Medical Director and other employees as necessary.

[2] Appellant originally pleaded only that his right to a safe work environment had been violated.  However, he subsequently raised the latter two claims in his opposition to Appellees' motion to dismiss.

# I. Background

Because this appeal arises from a dismissal for failure to state a claim, "we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Douglas v. Hirshon, 63 F.4th 49, 52 (1st Cir. 2023) (quoting Roe v. Lynch, 997 F.3d 80, 82 (1st Cir. 2021)).

## Facts

On February 1, 2020, a day after the United States Department of Health and Human Services declared a national public health emergency due to COVID-19, Massachusetts state officials confirmed the first COVID-19 case in the state. Throughout February, both the federal and Massachusetts governments promulgated directives to protect citizens from the unprecedented virus, including that institutions, such as Soldiers' Home, must identify patients with COVID-19 and isolate them from others.

By mid-February, the first resident ("Veteran One") at Soldiers' Home, who had a history of pneumonia and respiratory illness, exhibited COVID-19 symptoms. Despite the ongoing symptoms, Veteran One freely roamed the common areas of his unit. He was not tested for COVID-19 until, on March 16, 2020, a nurse reported -- for the second time -- to Assistant Director of Nursing Celeste Surreira ("Surreira") that Veteran One's symptoms were worsening. Surreira challenged the assessment but ultimately spoke with Veteran One's physician. After Veteran One tested

- 4 -

positive for COVID-19, Chief Nursing Officer Vanessa Lauziere ("Lauziere") asked Medical Director David Clinton ("Clinton") whether Veteran One should be moved to an isolation unit. However, Clinton responded that it was a "moot point" because "everyone ha[d] been exposed already" within the unit, so moving Veteran One elsewhere would put other residents at risk. No restriction was placed on Veteran One's movement, and staff in his area lacked personal protective equipment ("PPE"). On March 24, 2020, Veteran One passed away.

On March 4, 2020, Infectious Disease Nurse Vanessa Gosselin ("Gosselin") sent an email to Soldiers' Home's staff indicating that there was not enough PPE and instructing them to use gloves on an "as needed" basis. Gosselin also notified the staff that she had removed masks from the public areas to conserve resources and prevent pilfering. Employees who wanted a mask had to ask their unit supervisor.

On March 6, 2020, the Massachusetts Department of Veterans' Affairs advised Bennett Walsh ("Walsh"), Soldiers' Home's Superintendent, to limit staff movement, assess veterans' symptoms daily, develop an isolation plan for suspected cases, and encourage social distancing. This directive was ignored.

On March 10, 2020, Massachusetts Governor Charlie Baker declared a State of Emergency. That same day, Soldiers' Home's Board of Trustees met with Appellees to discuss the precautionary

- 5 -

measures taken in the face of the pandemic, including possible staffing shortages. Walsh reassured the Board of Trustees that, if needed, he would call staffing agencies that he had previously used for support. After that meeting, Walsh, Clinton, Lauziere, and Gosselin met to discuss the creation of isolation rooms for COVID-19 infected residents. Lauziere rejected the idea of designating staff to care for patients in isolation rooms. The next day, the first Soldiers' Home employee tested positive for COVID-19. Shortly thereafter, Massachusetts Secretary of Veterans' Affairs, Francisco Urena ("Urena"), emailed Walsh directing him to keep employees home if they were feeling ill.

By then, numerous other employees had contracted COVID-19. Walsh, over a loudspeaker, thanked staff who "showed up to work every day" and threatened that those who called in sick "[would] be penalized and [that] there [would] be disciplinary action." On March 17, 2020, Walsh informed staff via email that the executive team was keeping a "watchful eye" on PPE supplies. As a result, Lauziere and Gosselin informed staff that Soldiers' Home would not be distributing any more PPE because they were "running out," even though Soldiers' Home had a surplus of PPE at the time.

That same day, Appellant, a certified nursing assistant, reported to work. Because a nurse informed him that some veterans were experiencing COVID-19 symptoms, Appellant wore PPE to care

- 6 -

for those patients.  Gosselin reprimanded Appellant for his failure to maintain appropriate social distancing from the sick veterans. Three days later, Lauziere issued Appellant a formal written reprimand for caring for incontinent patients while wearing PPE and requested to meet with him the following Monday, March 23, 2020.  Lauziere did not attend the meeting.

By late March, Walsh, Clinton, Lauziere, and Gosselin participated in various conference calls with staff unions and employees from the Executive Office of Health and Human Services to discuss the lack of health and safety protocols at Soldiers' Home and the risk of contracting the virus faced by employees and veterans.  On March 25, 2020, Walsh, Clinton, Lauziere, and Surreira participated in a conference call with two Massachusetts Department of Public Health epidemiologists to discuss staffing issues and COVID–19 protocols.  Appellees concealed the fact that they lacked adequate staffing for isolation areas and did not address their plan to combine two dementia wards in order to mitigate staffing shortages.

On March 28, 2020, Holyoke Mayor Alex Morse ("Mayor Morse") received an anonymous email from a Soldiers' Home employee describing the deplorable conditions at the facility and reporting eight deaths.  Subsequently, Urena confronted Walsh about said deaths, asking him why he previously only reported two deaths, and scheduled a call for the next day.  During the call, Urena asked

Walsh if employees floated between infected and noninfected units. Later on, Mayor Morse called Walsh to discuss his concerns about Soldiers' Home. That same day, Urena and Walsh spoke again. Walsh discouraged Urena from speaking directly with Mayor Morse. However, later that day, Urena, Walsh, Mayor Morse, and others participated in a conference call wherein Mayor Morse explained that Walsh previously told him that there had been eight deaths at Soldiers' Home. After Urena confronted Walsh about the deaths, Walsh was removed from his position at Soldiers' Home.

Procedural Background

Appellant filed this action pursuant to 42 U.S.C. § 1983 in the District of Massachusetts, alleging that Appellees violated his substantive due process rights by failing to protect him from harm, to provide a safe working environment, and to provide adequate medical and nursing equipment. The complaint is bereft of any allegation that Appellant contracted COVID-19 at Soldiers' Home. Appellees moved to dismiss for failure to state a claim and asserted that, in any event, qualified immunity barred the suit.

Relying on Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992), the district court agreed with Appellees. In doing so, it held that there was no viable § 1983 substantive due process claim given that there was no constitutional duty to provide Appellant with a safe work environment. Next, the district court held that Appellant had not made viable substantive due

- 8 -

process claims under the state-created danger or bodily integrity doctrines. The district court further held that, even assuming that Appellant had established viable substantive due process claims, Appellees were nonetheless entitled to qualified immunity given the lack of clearly established law at the time of the events. Accordingly, the district court dismissed the suit. Appellant timely sought review.

## II. Discussion

We review de novo a district court's dismissal for failure to state a claim under Rule 12(b)(6), taking as true all well-pleaded factual allegations in the complaint and drawing all reasonable inferences therefrom in Appellant's favor. Douglas, 63 F.4th at 54-55. "The complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. at 55 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (cleaned up). We need not decide whether Appellant properly put forth both state-created danger and bodily integrity claims in his complaint because, even assuming both claims were properly advanced, Appellees are entitled to qualified immunity.

Under the doctrine of qualified immunity, government officials are immune from civil liability "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Est. of

Rahim by Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022) (quoting City of Tahlequah v. Bond, 142 S. Ct. 9, 11 (2021) (per curiam)) (cleaned up). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)). To assess whether a government official is entitled to qualified immunity, courts ask "(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." Id. An official may be entitled to qualified immunity "based on either prong." Id. The second prong has two aspects: "(1) the relative clarity of the governing law to a reasonable official on the date of the alleged wrong and (2) whether the specific characteristics of the situation confronted by the official would have made it clear to a reasonable official how the governing law applied in the given situation." Lawless v. Town of Freetown, 63 F.4th 61, 67 (1st Cir. 2023).

Because we may address either prong of the qualified immunity analysis first, we begin (and finish) by assessing the second prong, starting with the clarity of the governing law. See Punsky v. City of Portland, 54 F.4th 62, 66 (1st Cir. 2022); see also Penate v. Hanchett, 944 F.3d 358, 366 (1st Cir. 2019) ("Courts need not engage in the first inquiry and may choose, in their discretion, to go directly to the second.").

- 10 -

When defining "clearly established law," the Supreme Court has instructed courts that "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Although Appellant is not required to identify a case that is "directly on point," he does need to identify controlling precedent or a consensus among persuasive authority that "place[s] the statutory or constitutional question beyond debate." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting White v. Pauly, 580 U.S. 73, 79 (2017)); see also Est. of Rahim by Rahim, 51 F.4th at 413. Here, as troublesome as the factual allegations are, Appellant has failed to point to any case law clearly establishing applicable law that guarantees him the precise constitutional protections he claims, and we have found none.[3]

In support of his claim that Appellees violated his substantive due process rights, Appellant advances three possible theories: (1) a right to a safe working environment; (2) the state-created danger doctrine; and (3) the bodily integrity doctrine. The first of these, standing alone, is a non-starter -- the Supreme Court has held that "[n]either the text

---

[3] Appellant indeed states in his brief that "[t]here is scant case law on the issue of a state-created danger in the context of COVID-19."

- 11 -

nor the history of the Due Process Clause supports [the] claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." Collins, 503 U.S. at 126. By contrast, each of Appellant's alternate two theories are doctrines that we have previously recognized, but they have only arisen in contexts far afield from the claims presented in this case.

The state-created danger doctrine was conceived of as an exception to the general rule that a state's failure to prevent harm by a private actor does not constitute a constitutional violation. See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189 (1989). In DeShaney, the Supreme Court held that there was no constitutional violation where a child suffered abuse by his father but the child was not in state custody and the state "played no part in the[] creation" of the danger. Id. at 201. We and other circuits have since held that a state actor can be held liable when that state actor did "play a part" in the creation of a danger. See Irish v. Fowler, 979 F.3d 65, 73 (1st Cir. 2020) (collecting cases).

In order to establish a state-created danger claim, the plaintiff must show: "(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff; (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

(3) that the act or acts caused the plaintiff's harm; and (4) that the state actor's conduct, when viewed in total, shocks the conscience."  Id. at 75.  However, we have only contemplated the doctrine in the context of harm perpetrated by private actors, where law enforcement officers may have played a role in creating or enhancing the harm by those private actors.  See id. at 67-68 (applying the doctrine when police officers left a voicemail for a rape suspect, after which he murdered the victim's boyfriend, shot her mother, and kidnapped and raped the victim again); Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 72 (1st Cir. 2021) (considering application of the doctrine where officers responded to death threats by a landlord who later shot the tenants who had reported the threats); Rivera v. Rhode Island, 402 F.3d 27, 30 (1st Cir. 2005) (considering application of the doctrine where a witness was murdered the day before testifying in court and her estate alleged police should have protected her).  Our precedents are thus worlds apart from the particular circumstances within Soldiers' Home here.  And to the extent Appellant directs our attention to district-court and out—of-circuit cases holding that the state-created danger doctrine may be extended to cover "environmental" dangers, those cases fail to demonstrate that the required consensus exists as to the type of claim presented here.

In a further attempt to reassure his theory that Collins does not bar his claims, Appellant relies on Pauluk v. Savage, 836

F.3d 1117 (9th Cir. 2016).  In Pauluk, the Ninth Circuit recognized that the state-created danger doctrine is an exception to the general rule in Collins and thus allows for a claim to a safe workplace.  Id. at 1123-24.  There, despite Pauluk's repeated objections, his employer sent him to a facility that had been infested with toxic mold.  Id. at 1119.  Throughout the years, the exposure to mold adversely affected his health and he eventually passed away.  Id. at 1119-20.  However, given the rapidly evolving situation at Soldiers' Home in the face of a global pandemic, Pauluk is not sufficiently analogous to the present case so as to have clearly established that Appellees would be violating Appellant's rights.

Appellant's alternative theory that Appellees violated his right to bodily integrity fares no better under the qualified immunity rubric.  "Bodily integrity claims are based on the common law 'right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'"  Hootstein v. Amherst-Pelham Reg'l Sch. Comm., 361 F. Supp. 3d 94, 111 (D. Mass. 2019) (quoting Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251 (1891)).  Typical bodily integrity cases include forcibly administrating medication or exposing individuals to experimental treatments (such as nuclear-level radiation) without consent.  See Guertin v. Michigan, 912 F.3d 907, 919 (6th Cir. 2019).  Based on

- 14 -

Appellant's allegations in the complaint, we infer that his bodily integrity claim is based on psychological trauma, given that he does not claim to have been infected with COVID-19. However, Appellant has failed to point us to cases in which a bodily integrity claim has been sustained based on psychological harm that was sustained from a voluntary employee's exposure to risk at a medical facility. Thus, it was far from clearly established that Appellees' actions here would violate Appellant's right to bodily integrity.

Lastly, Appellant asks us to follow the Supreme Court's lead in Taylor v. Riojas, 141 S. Ct. 52 (2020) (per curiam), and find that prior caselaw is not necessary for his claims to survive given that Appellees' conduct "so obviously violate[d] the Constitution." In Taylor, an inmate in custody of the Texas Department of Criminal Justice was kept in "deplorably unsanitary conditions" for six days. Id. at 53. The Court held that the Fifth Circuit erred in granting the correctional officers qualified immunity given that none "could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." Id. Said circumstances obviated the need for clearly established law. Id. at 53-54.

Again, the facts in Taylor drastically differ from those before us. First, the exigent circumstances of the rapidly evolving yet unknown nature of COVID-19 called for immediate action. Cf. id. at 53 ("The Fifth Circuit identified no evidence that the conditions of [the] confinement were compelled by necessity or exigency."). Second, Appellant here was a voluntary employee, whereas Taylor involved an inmate in custody of the Texas Department of Criminal Justice. See id. Appellees here, moreover, acted in light of uncertain, developing, and constantly changing circumstances.[4]

## III. Conclusion

Accordingly, Appellant "has pointed to no precedent, and we have found none, establishing that the [Appellees' COVID-19 response] violates clearly established law." Est. of Rahim by Rahim, 51 F.4th at 418. Absent clearly established law, Appellees could not know beforehand that their alleged mismanagement of the COVID-19 outbreak at Soldiers' Home would violate Appellant's rights. While hindsight is 20/20, "[u]nder these circumstances, an objectively reasonable [government official] would not have

---

[4] To the extent the Appellant argues that Appellees' conduct was ministerial, not discretionary, and not protected by qualified immunity, see Davis v. Scherer, 468 U.S. 183, 196 n.14 (1984), we must reject this contention, for Appellant has failed to demonstrate how the "directives" that Appellees are alleged to have flouted did not leave Appellees a "substantial measure of discretion," id.

understood the challenged conduct to violate [Appellant's rights]." Id. at 417. "It would be inhumane not to feel a sense of outrage over [the situation], or a sense of deep sympathy for [those who passed away]. But our question is one of federal law, not one of sympathy." Rivera, 402 F.3d at 30. As such, Appellees are entitled to qualified immunity.

For the above reasons, the district court's dismissal is **affirmed**.[5]

---

[5] The parties did not bring to our attention the Ninth Circuit's opinion finding no qualified immunity based on a state-created-danger theory in a case involving a claim by prison guards who had contracted COVID-19 and were in charge of driving inmates who had the virus to local hospitals. See Polanco v. Diaz, 76 F.4th 918 (9th Cir. 2023). But in finding the alleged violation there to be a violation of clearly established law, the Ninth Circuit relied solely on its own precedents, see id. at 930-31. And, as we have explained, Appellant here has not identified any precedent from the Supreme Court, this circuit, or other circuits that would establish the requisite consensus to demonstrate clearly established law as to the type of claims in this case.