# United States Court of Appeals
## For the First Circuit

No. 23-1800

ANN SUNY,[*]

Plaintiff, Appellee,

v.

KCP ADVISORY GROUP, LLC,

Defendant, Appellant,

BI 40 LLC; EF, LLC; ROBERT EISENSTEIN,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Montecalvo, Circuit Judges.

Nicole L. Carnevale, with whom Allen N. David and Peabody & Arnold LLP were on brief, for appellant.
David R. Suny, with whom McCormack Suny, LLC was on brief, for appellee.

August 19, 2025

___

[*] Pursuant to Fed. R. App. P. 43(a)(1), Ann Suny was substituted to replace Sue T. Frost as Appellee in this action after Frost's death on May 1, 2024.

**MONTECALVO, Circuit Judge.** This interlocutory appeal concerns whether a court-appointed receiver is entitled to quasi-judicial immunity. Specifically, whether quasi-judicial immunity bars claims based on allegations that the receiver, appointed to manage a senior-living and memory-care facility, carried out a "resident dumping" scheme that led to residents' wrongful removal. Sue T. Frost formerly was a resident of Wood Haven Senior Living ("Wood Haven"), which operated as a memory-care facility in Tewksbury, Massachusetts. She alleged that Wood Haven's court-appointed receiver, Defendant KCP Advisory Group, LLC ("KCP"), conspired with other named defendants to unlawfully evict residents from the facility, including Frost. To execute the scheme, defendants falsely claimed that the Tewksbury Fire Department had ordered an emergency evacuation of the facility.

After she was transferred to a different facility, Frost sued KCP in federal court in the District of Massachusetts. KCP moved to dismiss the counts brought against it, arguing, in part, that it was entitled to absolute quasi-judicial immunity. The district court granted in part and denied in part KCP's motion. KCP appeals that order, arguing that the district court erred in concluding that immunity did not bar all of Frost's counts against KCP. Because we conclude that quasi-judicial immunity does bar each of Frost's claims against KCP, we reverse the portion of the

district court's judgment denying KCP's motion to dismiss Counts II, VI, VII, XI, and XIII.

## I. Background[1]

### A. Factual Background

Wood Haven was a 50-unit memory-care facility located in Tewksbury, Massachusetts. On May 3, 2021, Frost signed a residency agreement to secure a private room in the "300 wing" of the facility and moved in soon after. The agreement required that Wood Haven give Frost thirty days' notice if it intended to terminate her tenancy. Massachusetts law further required that assisted-living facilities, like Wood Haven, provide ninety days' notice to residents before ceasing operations. See 651 CMR 12.03(10)(a), amended by emergency regulation 1479 Mass. Reg. 55 (Sept. 7, 2022).[2]

On June 9, 2021, Massachusetts's Executive Office of Elder Affairs (the "EOEA") placed a moratorium on Wood Haven enrolling new residents due to the facility's violations of EOEA regulations. The situation further deteriorated in November 2021 when the EOEA suspended Wood Haven's certification as an

---

[1] Because this appeal stems from a district court's order on a motion to dismiss, we accept all well-pleaded factual allegations in Frost's complaint as true. Nystedt v. Nigro, 700 F.3d 25, 30 (1st Cir. 2012).

[2] On September 7, 2022, the regulation was amended to increase the required notice from ninety to 120 days.

assisted-living facility.  In response, BI 40, LLC ("BI 40") -- a company that had financed Wood Haven's continued operations -- filed an emergency motion in the U.S. District Court for the District of Massachusetts requesting that KCP be appointed as receiver for the facility.

On December 9, 2021, Judge Patti Saris held a hearing on BI 40's motion, which was attended by representatives for the EOEA, EF, LLC ("EF"),[3] BI 40, and KCP.[4]  During the hearing, and in response to Judge Saris's expressed concern for Wood Haven's vulnerable residents, BI 40's counsel assured the court that "the standard of care to the residents [would be] maintained."  Soon thereafter Judge Saris entered an order (the "Receivership Order") appointing KCP as receiver, which contained the following pertinent provisions:

> Subject to the Budget . . . and its fiduciary duties, the Receiver shall have and may exercise the following powers . . .
>
> [to] manage, operate, preserve[,] and maintain the Receivership Assets as a prudent person would, including, without limitation, the power to enter into, terminate[,] or negotiate contracts and make repairs or alterations to the Receivership Assets that the Receiver in its business judgment reasonably believes necessary to pursue the Objectives. . . .

---

[3]  EF, LLC managed Wood Haven's operations during the relevant time period.

[4]  Wood Haven residents, including Frost, and their families were not present at, and were never informed of, this proceeding.

> [to] take all such actions necessary to transact business with the Facility's existing residents, including entering into, amending, terminating[,] or otherwise modifying any lease or contract with an existing resident. . . .
>
> [to] hire, fire, select, and retain employees of [Wood Haven] as the Receiver deems reasonable or necessary to preserve and maintain the value of the Receivership Assets, including as necessary or desirable to provide appropriate quality patient care. . . .

Upon entry of the order, KCP took control of Wood Haven and retained EF to continue managing the facility's operations. The complaint further alleges that Robert Eisenstein, an EF representative and named defendant, acted as the facility's executive director.

On January 13, 2022, around five weeks after KCP's receivership began, a water pipe burst at Wood Haven, damaging the 300 wing of the facility where Frost lived. The damage rendered Frost's room and proximate portions of the facility unlivable, but Frost and other impacted residents were able to be relocated to other habitable rooms within the facility. Notably, around the time that the burst pipe caused water damage to Frost's room, residents also complained that the facility's heating system was malfunctioning, leaving the interior so cold that residents had to don extra layers of clothing to stay warm. The EOEA was alerted to these concerns, but the agency "declined to recognize the situation at the Facility as an emergency."

Despite the EOEA's determination, within four days of the water pipe bursting, Wood Haven's management had decided to close the facility. To do so, however, KCP first needed to remove Wood Haven's residents. Management therefore began contacting other care facilities to request that they accept the transfer of Wood Haven's residents. In these calls, and in communications on or around January 18 with residents and their legal representatives, Wood Haven representatives asserted that the transfer was necessary because the Tewksbury Fire Department had ordered an emergency evacuation of the facility. In one such letter from Robert Eisenstein, he reiterated that Wood Haven was "under orders [of the Tewksbury Fire Department] to have all [its] residents out of the building by [the following day] Wednesday[,] January 19, 2022." In fact, no such order existed.

It was also during that time period, on or around January 17, that the facility's management repeated its misrepresentation about the emergency evacuation order to the EOEA. But it was not until January 18, when the EOEA met with the Tewksbury Fire and Building Departments, that the agency discovered that there was no evacuation order. Later that day, the EOEA ordered Wood Haven to stop its efforts to relocate residents at least until residents were notified that no evacuation order had been issued. Wood Haven, however, disregarded that direction, declined to notify residents or their representatives

that no evacuation order existed, and, on January 19, proceeded to remove approximately twenty residents from the facility, including Frost.

On January 24, the EOEA informed residents and their representatives that there had been no evacuation order and that the facility had not complied with the EOEA's prescribed corrective measures.

## B. Procedural History

Frost filed the operative complaint -- the Third Amended Complaint -- on May 18, 2023 in the U.S. District Court for the District of Massachusetts asserting a number of state and common-law claims against KCP, BI 40, EF, and Eisenstein. KCP moved to dismiss the counts against it, arguing, in part, that the counts were barred by the doctrine of absolute quasi-judicial immunity.[5]

On August 29, 2023, the district court allowed in part and denied in part KCP's motion. The district court found that absolute quasi-judicial immunity barred claims "based on imperfect or negligent performance of receivership responsibilities" but not those alleging "that [KCP] lacked jurisdiction to evict Frost, did so contrary to law and contract, and in bad faith." Specifically,

---

[5] BI 40 also moved to dismiss Frost's counts brought against it, but this appeal addresses only those counts brought against KCP.

the order denied KCP's motion to dismiss as to Count II (violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A); Count VI (intentional infliction of emotional distress); Count VII (civil conspiracy); Count XI (fraud); and Count XIII (breach of fiduciary duty).[6]  KCP timely appealed.

## II. Standard of Review

We review the appeal of the district court's denial of absolute quasi-judicial immunity at the motion to dismiss stage de novo.  See Penate v. Kaczmarek, 928 F.3d 128, 135 (1st Cir. 2019).  In doing so, "we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor."  Nystedt v. Nigro, 700 F.3d 25, 30 (1st Cir. 2012) (quoting Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011)).

## III. Discussion[7]

On appeal, KCP contends that the district court erred in holding that KCP was not entitled to absolute quasi-judicial

---

[6]  In Frost's responsive brief, she asserted that we should "sua sponte reverse the District Court's decision to dismiss the Counts alleging other intentional misconduct" including Counts I, III, IV, V, and XII.  Frost, however, did not otherwise attempt to develop an argument to support this contention or, for that matter, explain what authority we would have to do so, thereby waiving the argument.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by developed argumentation, are deemed waived.").

[7]  The counts at issue in this appeal allege violations of state law, and our exercise of supplemental jurisdiction over those counts requires us to apply state substantive law to them.  See

immunity as to all of Frost's counts.  Immunity attaches, KCP

argues, because the acts that give rise to Frost's surviving counts

are judicial in nature and within its jurisdiction as receiver.

Although KCP invokes the doctrine of quasi-judicial immunity as a

defense to Frost's claims, we begin our analysis with the doctrine

from which it derives.

### A. Judicial and Quasi-Judicial Immunity

The doctrine of absolute judicial immunity for judges

seeks to ensure that judges, "in exercising the authority vested

in [them], shall be free to act upon [their] own convictions,

without apprehension of personal consequences to [themselves]"

from lawsuits filed by disappointed litigants.  Bradley v. Fisher,

80 U.S. 335, 347 (1871); see also Butz v. Economou, 438 U.S. 478,

512 (1978).  To achieve that aim, it bars all claims against judges

for acts done "in the exercise of their judicial functions."  Butz,

438 U.S. at 508 (quoting Bradley, 80 U.S. at 347).  However, the

mere fact that some act was performed by a judge does not alone

render the act part of the judicial function.  Rather, whether

immunity applies depends on the nature of the functions performed

and "the effect that exposure to particular forms of liability

---

Nystedt, 700 F.3d at 30.  Here, however, "[t]here are only minute
distinctions between the [Massachusetts and federal] bodies of
immunity law," id., and the parties do not assert that any of those
distinctions are implicated in this case.  Therefore, "we rely
interchangeably on federal and state precedents with respect to
the scope of quasi-judicial immunity."  Id.

would likely have on the appropriate exercise of those functions." Forrester v. White, 484 U.S. 219, 224 (1988). In other words, absolute judicial immunity protects only "truly judicial" -- i.e., adjudicative -- acts, and not "administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." Id. at 227.

Quasi-judicial immunity, as the name suggests, is an outgrowth of judicial immunity created to address the fact that certain judicial functions are performed by nonjudicial actors. It has two recognized applications. First, it applies to non-judges who act in a judicial capacity, meaning that they "exercise a discretionary judgment" in helping to resolve disputes between parties. Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 436 (1993) (quoting Imbler v. Pachtman, 424 U.S. 409, 423 n.20 (1976)); see also Nystedt, 700 F.3d at 30-31. Said differently, it extends to persons who, "irrespective of their title, perform functions essentially similar to those of judges . . . in a setting similar to that of a court." Bettencourt v. Bd. of Registration in Med. of Mass., 904 F.2d 772, 782 (1st Cir. 1990) (emphases omitted) (citing Butz, 438 U.S. at 511-17).

So, as when addressing questions of judicial immunity, quasi-judicial immunity will not attach if, for example, the function performed is not "truly judicial." Forrester, 484 U.S. at 227-28. Additionally, even for actions that are judicial in

nature, immunity will not attach to acts "taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 12 (1991); Cok v. Cosentino, 876 F.2d 1, 3 (1st Cir. 1989).

Second, quasi-judicial immunity has been extended to persons who "carr[y] out the orders of an appointing judge." Cok, 876 F.2d at 3 (citing Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno, 547 F.2d 1, 3 (1st Cir. 1976)). Thus, a person who "faithfully and carefully carries out" the court's order may invoke the immunity. Kermit Constr. Corp., 547 F.2d at 3. In contrast, immunity will not attach if the person "perform[s] acts which are clearly outside the scope of their jurisdiction." Cok, 876 F.2d at 3 (citing Demoran v. Witt, 781 F.2d 155, 158 (9th Cir. 1986)); see also Brooks v. Clark Cnty., 828 F.3d 910, 917–18 (9th Cir. 2016) (denying absolute quasi-judicial immunity where official "acted beyond the scope of [the judge]'s express and implied instructions").

### B. Application

Before the district court, KCP appears to have argued that it was entitled to the first type of quasi-judicial immunity. Motion to Dismiss Second Amended Complaint at 9, Frost v. BI 40 LLC, 2023 WL 6307530 (D. Mass. Aug. 29, 2023) (No. 22-cv-11005). Frost appears to have proceeded on this understanding, so too the district court, given its analysis of whether KCP's acts were taken "in complete absence of all jurisdiction." Frost, 2023 WL 6307530,

at *4.  On appeal, KCP accordingly argues it is entitled to quasi-judicial immunity because it contends that its acts were judicial in nature and not taken in the absence of all jurisdiction.  Because we conclude, for reasons we will explain, that KCP is entitled to immunity on this basis, we do not address whether KCP would be entitled to the type of quasi-judicial immunity that attaches to parties carrying out court orders.

We begin our analysis by considering KCP's alleged acts and the nature of the function that they served.  Frost's complaint alleges that KCP's acts include "engag[ing] in a conspiracy to resident dump, participat[ing] in the commission of a fraud by misrepresenting the reason why residents were evacuated, violat[ing] the EOEA's orders, and breach[ing] its fiduciary duties."  While those are the specific alleged acts, precedent instructs that we must look to the function performed by said acts and ask whether it "is a function normally performed by a judge." Mireles, 502 U.S. at 12.  For example, in Mireles, although the defendant judge was alleged to have directed officers to bring a person to his courtroom with excessive force (something he lacked authority to do), the Supreme Court explained that it was necessary to look at the underlying function -- ordering someone brought before the court -- and ask whether that function was judicial in nature.  Id. at 11-12.

Thus, our inquiry here is whether KCP's particular acts "relat[e] to a general function normally performed by a judge." Id. at 13. Here, each of KCP's alleged acts of malfeasance relate to its effort to remove residents from an unsafe facility subject to a receivership. That function, we think, is comparable to a court exercising its equitable powers to take control of a distressed asset and conducting an analogous evacuation due to unsafe conditions. Indeed, we think it beyond dispute that Judge Saris had the authority to order residents removed from the facility. And, if she had, she would have been immune from claims related to that act because she would have been acting in her "judicial capacity," id. at 12, and "exercising the authority vested in h[er]," Bradley, 80 U.S. at 347, related to a matter within her jurisdiction. That the immunity would attach if a judge performed a similar function supports finding that the function is indeed judicial in nature and that KCP, as receiver, is likewise entitled to immunity. For, as we have explained, declining to extend the immunity would render receivers "lightning rod[s] for harassing litigation." Kermit Constr. Corp., 547 F.2d at 3.

Having found that Frost's claims relate to a judicial function, quasi-judicial immunity will bar her counts unless KCP acted in "absence of all jurisdiction." Mireles, 502 U.S. at 12. We have no trouble concluding that KCP did not act absent jurisdiction here as the Receivership Order granted KCP the power

to "manage . . . the Receivership Assets as a prudent person would."  Facilitating the removal of residents due to unsafe conditions falls within this broad grant of authority.  <u>See</u> <u>Mireles</u>, 502 U.S. at 12-13.

## IV. Conclusion

Because the underlying function served by KCP's specific alleged acts was judicial in nature, and because KCP did not act in absence of jurisdiction, KCP is entitled to quasi-judicial immunity as to counts arising from those acts.  We therefore **<u>reverse</u>** the district court's denial of KCP's motion to dismiss as to Counts II, VI, VII, XI, and XIII.  Each party shall bear their own appellate costs and fees.